No. 23-60167

# In the United States Court of Appeals for the Fifth Circuit

ILLUMINA, INCORPORATED; GRAIL, INCORPORATED, now known as GRAIL, L.L.C.,

*Petitioners*,

v.

FEDERAL TRADE COMMISSION,

*Respondent.*

*On Petition for Review of an Order of the Federal Trade Commission*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
J. Alexander Rowell
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation.  In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: August 1, 2023                                         */s/ Brianne J. Gorod*
                                                                        Brianne J. Gorod

                                                                        *Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ................. i

CORPORATE DISCLOSURE STATEMENT ................................................. ii

TABLE OF CONTENTS ............................................................................ iii

TABLE OF AUTHORITIES ....................................................................... iv

INTEREST OF *AMICUS CURIAE* ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

ARGUMENT ........................................................................................... 6

    I.    *Seila Law* Did Not Call into Question the Legitimacy of
        Multimember Independent Agencies .................................................. 6

        A.    *Seila Law* Addressed Only the Innovation of an Independent
             Agency Led by a Single Director .................................................. 6

        B.    *Seila Law* Rested on Three Features Unique to Single-Director
             Independent Agencies .................................................................. 9

    II.    Established Practice Places the Validity of Multimember
        Independent Agencies Beyond Doubt ................................................ 15

    III.    Constitutional Text and History Further Underscore the Legitimacy
        of Multimember Independent Agencies ............................................. 23

CONCLUSION ........................................................................................ 29

CERTIFICATE OF SERVICE .................................................................... 1A

CERTIFICATE OF COMPLIANCE ............................................................. 2A

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ................................................................ 24

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ....................................................... 4, 19, 23

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) .................................................. 2, 4, 5, 8

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ......................................................... 5, 7, 9,
    22, 24, 29

*FTC v. Klesner*,
    280 U.S. 19 (1929) ............................................................. 20, 21

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935) .......................................................... *passim*

*In re Hennen*,
    38 U.S. 230 (1839) .................................................. 5, 24, 25, 26, 27

*Mallory v. Norfolk Southern Ry. Co.*,
    143 S. Ct. 2028 (2023) ............................................................ 15

*McAllister v. United States*,
    141 U.S. 174 (1891) ............................................................... 28

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) ................................................................. 17

*McPherson v. Blacker*,
    146 U.S. 1 (1892) .................................................................. 17

*Mistretta v. United States*,
    488 U.S. 361 (1989) ............................................................... 16

*Morrison v. Olson*,
    487 U.S. 654 (1988) ........................................................... 20, 21

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Myers v. United States,*
272 U.S. 52 (1926) ............................................................ 24, 25, 26, 29

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) .................................................................. 10

*NLRB v. Noel Canning,*
573 U.S. 513 (2014) ........................................................ 4, 16, 17, 24

*Parsons v. United States,*
167 U.S. 324 (1897) .................................................................. 28

*Plaut v. Spendthrift Farm, Inc.,*
514 U.S. 211 (1995) .................................................................. 10

*The Pocket Veto Case,*
279 U.S. 655 (1929) .................................................................. 16

*Seila Law LLC v. CFPB,*
140 S. Ct. 2183 (2020) .......................................................... *passim*

*Shurtleff v. United States,*
189 U.S. 311 (1903) .................................................................. 28

*Stuart v. Laird,*
5 U.S. 299 (1803) .................................................................. 18, 22

*United States v. Curtiss-Wright Exp. Corp.,*
299 U.S. 304 (1936) .................................................................. 19

*United States v. Midwest Oil Co.,*
236 U.S. 459 (1915) .................................................................. 17

*Va. Off. for Prot. & Advoc. v. Stewart,*
563 U.S. 247 (2011) .................................................................. 9

*Wiener v. United States,*
357 U.S. 349 (1958) .................................................................. 21

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 ....................................................................... 16

*Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ............................................................. 3, 16

<u>Constitutional Provisions, Statutes, and Legislative Materials</u>

Act of July 27, 1789, ch. 4, 1 Stat. 28 ......................................... 26

Act of May 15, 1820, ch. 102, 3 Stat. 582 .................................. 28

Act of Mar. 2, 1889, ch. 382, 25 Stat. 855 ................................. 18

Act of June 29, 1906, ch. 3591, 34 Stat. 584 ............................. 18

An Act to Create a Federal Trade Commission, ch. 311, 38 Stat. 717
  (1914) ................................................................................. 20

An Act to Regulate Commerce, ch. 104, 24 Stat. 379 (1887) .............. 1, 10, 18

1 Annals of Cong. (1789) ............................................................ 26

Reorganization Plan No. 8 of 1950, 64 Stat. 1264 ..................... 12

15 U.S.C. § 41 ................................................................ 11, 12, 13

15 U.S.C. § 45 .............................................................................. 20

U.S. Const. art. I, § 8, cl. 18 ................................................. 23, 25

U.S. Const. art. II, § 1, cl. 1 ...................................................... 4, 23

U.S. Const. art. II, § 2 ............................................................. 23, 24

U.S. Const. art. II, § 3 ................................................................ 23

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Books, Articles, and Other Authorities

1935 FTC Ann. Rep.,
https://www.ftc.gov/sites/default/files/documents/reportsannual/annual-report-1935/ar1935_0.pdf ........................................................................ 21

Daniel D. Birk, *Interrogating the Historical Basis for A Unitary Executive*, 73 Stan. L. Rev. 175 (2021) .................................................... 25

Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111 (2000) ................................................................. 18, 19, 23

Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353 (1927) .................................... 28

David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161 (1995) .............................................................................. 26

Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725 (1996) ............................................................................................... 25

Neal Kumar Katyal & Thomas P. Schmidt, *Active Avoidance: The Modern Supreme Court and Legal Change*, 128 Harv. L. Rev. 2109 (2015) ..................................................................................................... 10

James Kent, *Commentaries on American Law* (1826) .............................. 27

Leah M. Litman, *Debunking Antinovelty*, 66 Duke L.J. 1407 (2017) ........ 10

Letter from James Madison to Edmund Pendleton (June 21, 1789) .......... 27

Letter from James Madison to Spencer Roane (Sept. 2, 1819) .................. 17

Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021 (2006) ................................................................................ 26, 27

*Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ....... 25

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ............................................................................................... 25, 28

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The Federalist No. 39* (Clinton Rossiter ed., 1961) .................................... 27

White House Historical Association, *When Was Electricity First Installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house ......................... 1

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works to improve understanding of the Constitution and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress has been creating multimember independent agencies like the Federal Trade Commission for most of the nation's history—they have been part of the executive branch for longer than the light bulb.[2]  Nearly a century of Supreme Court precedent has affirmed their constitutional legitimacy.  And relying on that precedent, Congress has established dozens of boards and commissions wielding vast executive power whose leaders are removable only for cause.

In *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), the Supreme Court addressed "a new situation" involving the "almost wholly unprecedented" creation

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission.  All parties have consented to the filing of this brief.

[2] *Compare* An Act to Regulate Commerce, ch. 104, § 11, 24 Stat. 379, 383 (1887) (establishing Interstate Commerce Commission), *with* White House Historical Association, *When Was Electricity First Installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house (electricity installed at White House and at State, War, and Navy Building in 1891).

of an independent agency led "by a single individual." *Id.* at 2211, 2201, 2197. Making clear that it was not "revisit[ing] [its] prior decisions," the Court found "compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.* at 2192.

  *Seila Law*'s holding rested on three features of single-director independent agencies that the Court concluded distinguish them from "a traditional independent agency, run by a multimember board." *Id.* First, the Court wrote, such agencies are "an innovation with no foothold in history or tradition," and the Court's precedent involving multimember bodies was not an invitation for "additional restrictions on the President's removal authority" or other "innovative intrusions on Article II." *Id.* at 2202, 2206, 2205. Second, the Court concluded that a single-director structure is a greater imposition on presidential oversight, "foreclos[ing] certain indirect methods of Presidential control" and depriving some presidents of "any opportunity to shape [the agency's] leadership." *Id.* at 2204. Third, the Court concluded that empowering a single director with "no colleagues to persuade" impermissibly "clashes with constitutional structure by concentrating power in a unilateral actor." *Id.* at 2204, 2192 (quotation marks omitted).

  The Court has since reiterated that it "did not revisit [its] prior decisions" in *Seila Law* but merely declined "to extend those precedents" to single-director agencies. *Collins v. Yellen*, 141 S. Ct. 1761, 1783 (2021) (quotation marks

omitted). Nevertheless, Petitioners contend that the opinion revolutionized the long-settled understanding of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which upheld removal limits for FTC commissioners and affirmed the constitutionality of "expert agencies led by a *group* of principal officers removable by the President only for good cause," *Seila Law*, 140 S. Ct. at 2192 (emphasis in original). According to Petitioners, even though FTC Commissioners serve "as members of a board or commission," *Seila Law*, 140 S. Ct. at 2201, "*Seila Law* compels the conclusion that *Humphrey's Executor* does not control . . . this case," Pet'rs Br. 21, and that the Constitution requires FTC commissioners to be removable at will.

*Seila Law* belies that interpretation, repeatedly emphasizing that it addresses only the "new configuration" of "an independent agency that wields significant executive power *and is run by a single individual*." *Id.* at 2192 (emphasis added); *see, e.g.*, *id.* at 2211 ("principal officers who, *acting alone*, wield significant executive power" (emphasis added)). And even if *Seila Law* were not so definitive on this point, Petitioners' arguments would still be foreclosed by established practice, which has long settled the constitutional legitimacy of multimember independent agencies.

In separation-of-powers cases, the judiciary places "significant weight upon historical practice," *Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quotation marks

omitted), including practice that "began after the founding era," because it embodies "the compromises and working arrangements that the elected branches of Government themselves have reached," *NLRB v. Noel Canning*, 573 U.S. 513, 525-26 (2014).

Congress has been assigning regulatory authority to multimember independent agencies since the nineteenth century. These agencies have wielded substantial executive power for generations. And the Supreme Court has consistently affirmed their constitutionality—right up to its recognition in *Seila Law* that Congress could amend the constitutional defects of the Consumer Financial Protection Bureau, "an independent agency that wields significant executive power," by "converting the CFPB into a multimember agency." 140 S. Ct. at 2192, 2211. Thus, even if Petitioners were correct that the legitimacy of multimember independent agencies were suddenly up for debate, the long-established practice of the elected branches resolves that debate.

Significantly, the FTC cannot be distinguished from the host of other multimember regulatory agencies across the federal government. All of these agencies wield the Constitution's "executive Power" as it is understood today. *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. art. II, § 1, cl. 1). And there is no "clear standard," *Collins*, 141 S. Ct. at 1784, by which to pick and choose which of them wields "vast" power, Pet'rs Br. 12. As the

4

Supreme Court recently underscored, the validity of removal limits does not hinge on a subjective inquiry into "the relative importance of the regulatory and enforcement authority of disparate agencies." *Collins*, 141 S. Ct. at 1785. And notably, the FTC has wielded executive power since its inception—including at the time that *Humphrey's Executor* upheld its removal protections.

Multimember independent agencies like the FTC are also fully consonant with the Constitution's original meaning. The constitutional text, which "is silent with respect to the power of removal," *In re Hennen*, 38 U.S. 230, 258 (1839), does not specify the exact boundary between the president's authority to supervise subordinates and Congress's authority to shape the federal government. The early consensus that presidents have inherent removal authority was coupled with a recognition that Congress can limit this authority to some extent, which Congress began doing in the nineteenth century. And as the Supreme Court has consistently acknowledged, conditioning removal on good cause is a permissible limit for multimember expert bodies.

In *Seila Law*, as in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), the Supreme Court simply drew a line in the sand: confronting a "new situation," *id.* at 483, it prohibited "additional restrictions on the President's removal authority" that have "no foothold in history or tradition," *Seila Law*, 140 S. Ct. at 2206, 2202. It did not license lower courts to strike down a longstanding structure

the Court has consistently upheld—that of a "traditional independent agency

headed by a multimember board or commission." *Id.* at 2193.

## ARGUMENT

**I.**    ***Seila Law* Did Not Call into Question the Legitimacy of Multimember Independent Agencies.**

**A.**    ***Seila Law* Addressed Only the Innovation of an Independent Agency Led by a Single Director.**

One would not know from Petitioners' telling that *Seila Law* revolved

around the CFPB's unusual single-director structure. But the Court could hardly

have been clearer: "We hold that the CFPB's leadership *by a single individual*

removable only for inefficiency, neglect, or malfeasance violates the separation of

powers." 140 S. Ct. at 2197 (emphasis added). "Instead of placing the agency

under the leadership of a board with multiple members," Congress "deviated from

the structure of nearly every other independent administrative agency in our

history." *Id.* at 2191. "The question before us," the Court said, "is whether *this*

*arrangement* violates the Constitution's separation of powers." *Id.* (emphasis

added).

According to the Court, the president's Article II authority "generally

includes the ability to remove executive officials," but there are "exceptions" to

this rule. *Id.* at 2197, 2192. One exception was first recognized in *Humphrey's*

*Executor*, which "held that Congress could create expert agencies led by a *group* of

principal officers removable by the President only for good cause." *Seila Law*, 140 S. Ct. at 2192 (emphasis in original).

In *Seila Law*, the Court was "asked to extend these precedents to a new configuration: an independent agency that wields significant executive power *and is run by a single individual*." *Id.* (emphasis added). The Court declined that invitation because it concluded that there were "compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.* That arrangement, it said, "lacks a foundation in historical practice and clashes with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control." *Id.*

In refusing to broaden its precedent, the Court was clear that "we need not and do not revisit our prior decisions allowing certain limitations on the President's removal power." *Id.* Rather, the Court merely declined "to extend those precedents to the 'new situation' before us," *Seila Law*, 140 S. Ct. at 2201 (quoting *Free Enter. Fund*, 561 U.S. at 483), which introduced a "novel impediment" to presidential authority, *id.* at 2198; *accord Free Enter. Fund*, 561 U.S. at 483-84 (striking down "new situation" of "multilevel protection from removal," but declining "to reexamine any . . . precedents").

In short, *Seila Law* was crystal clear that it targeted only the new phenomenon of removal protections for solo agency heads: "While we have

previously upheld limits on the President's removal authority in certain contexts, we decline to do so when it comes to principal officers who, *acting alone*, wield significant executive power." 140 S. Ct. at 2211 (emphasis added).

If any doubt remained, *Collins v. Yellen* eliminated it. In that challenge to the single-director Federal Housing Finance Agency, the Court concluded that "[a] straightforward application of our reasoning in *Seila Law* dictates the result." 141 S. Ct. at 1784. And in *Seila Law*, the Court explained, "[w]e did not revisit our prior decisions allowing certain limitations on the President's removal power, but we found compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.* at 1783 (quotation marks omitted).

*Collins* specifically rejected an argument that the validity of removal limits turns on "the nature and breadth of an agency's authority." *Id.* at 1784; *cf.* Pet'rs Br. 20-21 (arguing that *Humphrey's Executor* does not apply because the FTC has broader powers today). Instead, the Court's "straightforward" application of *Seila Law* was simple: "The FHFA (like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd-Frank Act) restricts the President's removal power." *Collins*, 141 S. Ct. at 1784.

**B.    *Seila Law* Rested on Three Features Unique to Single-Director Independent Agencies.**

After concluding that precedent did not resolve the legitimacy of removal protection for agency leaders serving alone, *Seila Law* discussed three aspects of single-director leadership that it concluded make such removal limits untenable. None exists here.

**1.  *Historical Anomaly***

First and foremost, *Seila Law* stressed that "[t]he CFPB's single-Director structure is an innovation with no foothold in history or tradition" that was "almost wholly unprecedented."  140 S. Ct. at 2201-02.  In "only a handful of isolated incidents" had Congress elsewhere "provided good-cause tenure to principal officers who wield power alone rather than as members of a board or commission." *Id.* at 2201 (quotation marks omitted).  And nearly all of those "isolated examples" were also "comparatively recent and controversial."  *Id.* at 2202.  All told, the "lack of historical precedent" for the Bureau's single-director structure indicated a "severe constitutional problem."  *Id.* at 2201 (quotation marks omitted).

*Seila Law* was not the first time the Court articulated a suspicion of novelty. "Lack of historical precedent can indicate a constitutional infirmity," the Court has written, because novelty "is often the consequence of past constitutional doubts." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 260 (2011).  The modern Court has applied this skepticism toward "novel governmental structures," *Seila*

*Law*, 140 S. Ct. at 2207, across multiple contexts. *See NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) (while "not necessarily fatal . . . sometimes the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent" (quotation marks omitted)); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995) (Congress's "prolonged reticence" to assert authority creates an "inference" that it is "constitutionally proscribed"); *see also* Neal Kumar Katyal & Thomas P. Schmidt, *Active Avoidance: The Modern Supreme Court and Legal Change*, 128 Harv. L. Rev. 2109, 2139 (2015) (discussing the Court's "antinovelty doctrine," which presumes that "a law without historical precedent is constitutionally suspect"); Leah M. Litman, *Debunking Antinovelty*, 66 Duke L.J. 1407, 1411-12 (2017) (discussing prominence of "antinovelty rhetoric" in Supreme Court opinions).

Unlike the "historical anomaly" of the CFPB, *Seila Law*, 140 S. Ct. at 2202, there is nothing remotely novel about the Federal Trade Commission. One of the nation's first independent regulators, it has the quintessential structure of a multimember independent agency. *Compare* Act to Regulate Commerce, § 11, 24 Stat. at 383 (establishing the Interstate Commerce Commission with a bipartisan structure of five Commissioners, serving six-year terms, removable for cause), *with* 15 U.S.C. § 41 (establishing the FTC with a bipartisan structure of five Commissioners, serving seven-year terms, removable for cause).

10

While initial proposals for the CFPB called for a similar structure, Congress departed from the established model "in one critical respect." *Seila Law*, 140 S. Ct. at 2192-93. "Rather than create a traditional independent agency headed by a multimember board or commission, Congress elected to place the CFPB under the leadership of a single Director." *Id.* That critical difference, the Court concluded, meant that precedent could not justify the CFPB's "innovative intrusions on Article II." *Id.* at 2205.

## 2. *Greater Encroachment on Presidential Oversight*

*Seila Law* also concluded that removal protections for agency heads who serve alone intrude on presidential authority more than protections for members of boards or commissions, rendering the CFPB's structure a "novel impediment to the President's oversight of the Executive Branch." 140 S. Ct. at 2192, 2198.

The CFPB's defenders argued that a single-director independent agency is equally accountable to the president as a multimember agency. *See, e.g.*, Br. for Court-Appointed *Amicus Curiae* 44-46, *Seila Law*, 140 S. Ct. 2183 (No. 19-7). But the Court firmly rejected that argument, holding that a single-director structure "forecloses certain indirect methods of Presidential control" available to influence multimember bodies. *Seila Law*, 140 S. Ct. at 2204.

"Because the CFPB is headed by a single Director with a five-year term," a president could spend much of her term unable to remove a director holding

diametrically opposed views. *Id.* "To make matters worse," the Court elaborated, "the agency's single-Director structure means the President will not have the opportunity to appoint any other leaders—such as a chair or fellow members of a Commission or Board—who can serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies." *Id.* Indeed, "some Presidents may not have any opportunity to shape its leadership and thereby influence its activities," because they will "*never*" be able to appoint a director. *Id.*

None of this applies to the FTC. With five commissioners serving staggered terms, regular vacancies allow every president to shape the agency's leadership and agenda through appointments. *See* 15 U.S.C. § 41. Since 1950, moreover, the president has selected the FTC's chair. *Id.*; *see* Reorganization Plan No. 8 of 1950, 64 Stat. 1264, 1265 (effective May 24, 1950). The chair holds unique sway over the FTC's work by controlling "the use and expenditure of funds" and "the appointment and supervision of personnel," along with other "executive and administrative functions." 64 Stat. at 1264. As a result, the president now enjoys greater control over the agency than he did during the *Humphrey's Executor* era. Furthermore, the commissioners' staggered terms and the requirement of bipartisan representation, 15 U.S.C. § 41, help prevent "abrupt shifts in agency leadership," *Seila Law*, 140 S. Ct. at 2200.

12

In short, the FTC's familiar and longstanding structure involves no "innovative intrusions on Article II." *Seila Law*, 140 S. Ct. at 2205.

### 3. *Concentration of Power in a Single Person*

The third feature of the CFPB's structure on which *Seila Law* rested was its consolidation of power in "a unilateral actor insulated from Presidential control." 140 S. Ct. at 2192. According to the Court, this configuration simply has "no place in our constitutional structure." *Id.* at 2201. With "the sole exception of the Presidency, that structure scrupulously avoids concentrating power in the hands of any single individual." *Id.* at 2202.

As *Seila Law* explained, the Framers made the executive branch "unique in our constitutional structure" by vesting power in a single person. *Id.* at 2203. They balanced that choice by making the president "the most democratic and politically accountable official in Government" and by placing other executive officers under his "supervision and control." *Id.* This "constitutional strategy," in a nutshell, was to "divide power everywhere except for the Presidency, and render the President directly accountable to the people." *Id.*

"The CFPB's single-Director structure," however, "contravene[d] this carefully calibrated system by vesting significant governmental power in the hands of a single individual." *Id.* "With no colleagues to persuade," this individual could

13

"unilaterally" wield a range of enforcement, adjudicatory, and rulemaking authorities.  *Id.* at 2203-04.

The Court found this arrangement a far cry from the "multimember body of experts, balanced along partisan lines" that it previously had approved.  *Id.* at 2199. But the FTC's structure—as discussed in *Humphrey's Executor* and as it exists today—matches that traditional profile: "Composed of five members—no more than three from the same political party—the [FTC] was designed to be 'non-partisan' and to 'act with entire impartiality.'"  *Id.* at 2198-99 (quoting *Humphrey's Ex'r*, 295 U.S. at 624).  Its duties "called for 'the trained judgment of a body of experts'" to be "informed by experience," while its "staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'"  *Id.* at 2199 (quoting *Humphrey's Ex'r*, 295 U.S. at 624).

In contrast, the CFPB director had no "peers" to share his authority or to temper his decisions.  *Id.* at 2191.  The Court held that "*this arrangement* violates the Constitution's separation of powers," *id.* (emphasis added), because it "clashes with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control," *id.* at 2192.  The same cannot be said of "a traditional independent agency, run by a multimember board with a diverse set of viewpoints and experiences."  *Id.* at 2192 (quotation marks omitted).

**II.      Established Practice Places the Validity of Multimember Independent Agencies Beyond Doubt.**

As discussed above, *Seila Law* confined itself to "the novel context of an independent agency led by a single Director." 140 S. Ct. at 2192. But ignoring most of the opinion, Petitioners characterize *Seila Law* as establishing a revolutionary new proposition—that all agency leaders who possess "any executive power" must be removable at will, Pet'rs Br. 19, even if they serve in "a traditional independent agency headed by a multimember board or commission," *Seila Law*, 140 S. Ct. at 2193. In Petitioners' view, *Seila Law*'s description of *Humphrey's Executor* functionally overruled that decision, rendering it inapplicable even to the FTC itself. The Supreme Court, however, has cautioned lower courts to "follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Mallory v. Norfolk Southern Ry. Co.*, 143 S. Ct. 2028, 2038 (2023) (quotation marks omitted); *see also United States v. Vargas*, No. 21-20140, 2023 WL 4702277, at *3-6 (5th Cir. July 24, 2023) (en banc) ("Inferior courts must follow directly applicable Supreme Court precedent that has not been overruled or modified.").

Overruling *Humphrey's Executor* is precisely what the Justices said they were *not* doing in *Seila Law*. *See* 140 S. Ct. at 2206 ("[W]e do not revisit *Humphrey's Executor* or any other precedent[.]"); *supra* Part I.A. *Seila Law* instead rejected the validity of "an independent agency that wields significant

executive power *and is run by a single individual*." 140 S. Ct. at 2192 (emphasis added). Petitioners ask this Court to simply lop off part of that statement and similar passages throughout the opinion. *E.g.*, *id.* at 2211 ("principal officers who, *acting alone*, wield significant executive power" (emphasis added)); *id.* at 2201 ("an independent agency *led by a single Director* and vested with significant executive power" (emphasis added)).

Even setting those passages aside, the notion that *Seila Law* outlaws an agency structure that has existed since the nineteenth century would be deeply implausible. Established practice has long settled the legitimacy of removal protections for multimember agencies.

The flip side of the Supreme Court's suspicion of "novel governmental structures," *Seila Law*, 140 S. Ct. at 2207, is that "'traditional ways of conducting government . . . give meaning' to the Constitution," *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)). For that reason, the Court "put[s] significant weight upon historical practice" in separation-of-powers cases. *Zivotofsky*, 576 U.S. at 23 (quotation marks omitted); *see The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("established practice is a consideration of great weight" for such constitutional provisions). When construing the Constitution's broadly phrased divisions among the branches, judges "must hesitate to upset the

compromises and working arrangements that the elected branches of Government themselves have reached." *Noel Canning*, 573 U.S. at 526.

Established practice is crucial "even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Id.* at 525; *see id.* at 528-29 (relying on history of intra-session recess appointments that began after the Civil War); *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915) ("[I]n determining . . . the existence of a power, weight shall be given to the usage itself, even when the validity of the practice is the subject of investigation."). As James Madison wrote, it "was foreseen at the birth of the Constitution, that difficulties and differences of opinion . . . in expounding terms & phrases necessarily used in such a charter . . . might require a regular course of practice to liquidate & settle the meaning of some of them." *Noel Canning*, 573 U.S. at 525 (quoting Letter from James Madison to Spencer Roane (Sept. 2, 1819)).

Precedent has "continually confirmed Madison's view." *Id.*; *e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("where there is ambiguity or doubt" in constitutional interpretation, "subsequent practical construction is entitled to the greatest weight"); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819) ("a doubtful question" concerning the separation of powers, "if not put at rest by the practice of the government, ought to receive a considerable impression from that practice");

*Stuart v. Laird*, 5 U.S. 299, 309 (1803) ("practice and acquiescence" can "fix[] the construction" of constitutional provisions, "afford[ing] an irresistible answer" to contrary interpretations).

Congress has been assigning regulatory authority to independent, multimember agencies for most of the nation's history, beginning nearly 150 years ago with the Interstate Commerce Commission. *See* Act to Regulate Commerce, § 11, 24 Stat. at 383 (making ICC commissioners removable only for cause). The ICC had investigative and enforcement authority over the monumentally important railroad industry, including the power to issue cease-and-desist orders, to require payment of reparations, and to enforce its orders in court. *See id.* §§ 12-16, 20; *cf.* Pet'rs Br. 20 (emphasizing the FTC's role as an "enforcement agency" with authority to "bring[] suit in both administrative proceedings and federal court").

Although the Interior Secretary initially had some authority over the ICC, *see* Act to Regulate Commerce, §§ 18, 21, 24 Stat. at 386-87, Congress eliminated it two years later, *see* Act of Mar. 2, 1889, ch. 382, §§ 7-8, 25 Stat. 855, 861-62. And in 1906, Congress empowered the ICC to prescribe "fair" and "reasonable" practices, as well as maximum railroad rates, *see* Act of June 29, 1906, ch. 3591, § 4, 34 Stat. 584, 589, cementing its status as "a very powerful agency," Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1130 (2000).

In the early twentieth century, "a multitude of new agencies were established using the ICC as their prototype," including "the Federal Reserve Board (1913), Federal Trade Commission (1914), Federal Radio Commission (1927), Federal Power Commission (1930), Securities and Exchange Commission (1934), Federal Communications Commission (1934), National Labor Relations Board (1935), Bituminous Coal Commission (1935), and Federal Maritime Commission (1936)." *Id.* at 1116 & n.14. Similar agencies proliferated throughout the rest of the century. And the "critical element of independence" for these agencies is "protection . . . against removal except 'for cause.'" *Id.* at 1138.

The long pedigree of multimember independent agencies is all but dispositive of their legitimacy. "A legislative practice . . . marked by the movement of a steady stream for a century and a half of time" indicates "the presence of unassailable ground for the constitutionality of the practice." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 327-28 (1936).

For generations, these agencies have wielded substantial executive power. Although the Supreme Court initially conceived of their powers as "quasi-legislative or quasi-judicial," rather than as executive, *Seila Law*, 140 S. Ct. at 2198 & n.2 (quotation marks omitted), it now recognizes that the functions which independent agencies have long carried out—enforcement, rulemaking, adjudications—are "exercises of . . . the 'executive Power'" under the Constitution,

19

*Arlington*, 569 U.S. at 304 n.4.  Thus, beginning with *Humphrey's Executor*, the Court has consistently approved of removal protections for multimember agencies with powers that "at the present time" are "considered executive."  *Morrison v. Olson*, 487 U.S. 654, 699 n.28 (1988) (quotation marks omitted).

Petitioners and their *amici* suggest otherwise, downplaying the early FTC's powers as merely "'making investigations and reports to Congress' and 'making recommendations to courts as a master in chancery.'"  Pet'rs Br. 19 (quoting *Seila Law*, 140 S. Ct. at 2198-99); *see, e.g.*, Indiana Br. 3-4 (claiming that the "FTC did not exercise executive power when all it could do was advise Congress").  But the early FTC did far more.  As *Humphrey's Executor* acknowledged, it was also "empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition."  295 U.S. at 620 (quoting 15 U.S.C. § 45).  In the course of "filling in and administering the details" of that prohibition, *id.* at 628, the FTC could charge private parties with using unfair methods of competition, adjudicate those charges in administrative hearings, issue cease-and-desist orders, and enforce those orders in court.  *See id.* at 620-21; An Act to Create a Federal Trade Commission, ch. 311, § 5, 38 Stat. 717, 719-20 (1914).

Thus, the FTC in 1935 clearly did have "prosecutorial authority."  *Contra* CFJ Br. 27-31; *see also FTC v. Klesner*, 280 U.S. 19, 27 (1929) (the FTC acts as a "prosecutor" when enforcing the prohibition on unfair methods of competition); *id.*

at 25 ("The formal complaint is brought in the Commission's name; the prosecution is wholly that of the government[.]").[3]

Regardless of what additional authorities the FTC has today, therefore, it unquestionably wielded executive power at the time of *Humphrey's Executor*. And regardless of whether the reasoning in *Humphrey's Executor* reflects an outdated conception of executive power, it remains true that the Court upheld removal protections for a multimember expert agency that, by today's lights, possessed substantial executive power.

Since then, the Court has only reaffirmed that holding. In *Wiener v. United States*, the Court confronted "a variant of the constitutional issue decided in *Humphrey's Executor*" and reached the same result. 357 U.S. 349, 351 (1958). By the time of *Morrison*, it had been established for half a century that "the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." 487 U.S. at 687 (quoting *Humphrey's Ex'r*, 295 U.S. at 630).

---

[3] Likewise, the FTC's settlement of cases as part of its prosecutorial authority is far from new. *Contra* CFJ Br. 31-33 (discussing "use of consent orders"). In the decade preceding *Humphrey's Executor*, the FTC entered into more than 2,000 agreements to dispose of cases by stipulation, allowing respondents to "enter into a stipulation of the facts and voluntarily agree to cease and desist forever from the alleged unfair methods set forth therein." 1935 FTC Ann. Rep. 49-51, https://www.ftc.gov/sites/default/files/documents/reports_annual/annual-report-1935/ar1935_0.pdf.

Two decades later, the Court again confirmed the validity of removal protections for multimember bodies wielding significant executive power. It held that Article II was satisfied where officers within the SEC were shielded from removal by "a single level of good-cause tenure." *Free Enter. Fund*, 561 U.S. at 509. Such officers were adequately "subject . . . to Presidential oversight." *Id.*

*Seila Law* again reinforced these principles. Not only did the Court emphatically base its holding on the "new situation" of an independent officer wielding power "alone," but it explained that Congress could cure the constitutional defect while preserving removal limits by "converting the CFPB into a multimember agency." 140 S. Ct. at 2211.

Thus, for nearly a century, an unbroken line of decisions has approved a governmental structure pioneered another half-century earlier. Over the generations, Congress has relied on this precedent to create "some two-dozen multimember independent agencies" with for-cause removal protections. *Id.* at 2206. This "practical exposition" of the Constitution is, by now, "too strong and obstinate to be shaken." *Laird*, 5 U.S. at 309.

Significantly, the FTC cannot be distinguished from the many other multimember independent agencies with enforcement or rulemaking powers. Such agencies include the Federal Reserve Board of Governors, Federal Deposit Insurance Corporation, Federal Election Commission, Federal Energy Regulatory

Commission, National Labor Relations Board, Nuclear Regulatory Commission, Securities and Exchange Commission, U.S. International Trade Commission, and others. *See* Breger & Edles, *supra*, at 1236-94. Even more agencies possess adjudicatory authority. *See id.*

*All* of these multimember agencies wield the Constitution's "executive Power." *Arlington*, 569 U.S. at 304 n.4. *Seila Law* did not silently invalidate their legitimacy in a case that did not even involve a multimember agency.

## III.    Constitutional Text and History Further Underscore the Legitimacy of Multimember Independent Agencies.

In addition to being validated by precedent and established practice, multimember independent agencies like the FTC are fully consonant with the Constitution's original meaning.

When a limit on removal authority is challenged as unconstitutional, there are two sides to the coin: on one side, the president's "executive Power" and duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 1, cl. 1; *id.* art. II, § 3, and on the other, Congress's authority to define the federal government's "Departments" and "Officers," *id.* art. II, § 2, and to pass laws necessary and proper for "carrying into Execution . . . all . . . Powers vested . . . in the Government," *id.* art. I, § 8, cl. 18. The precise line between these powers has long been contested, but the president has never been understood to enjoy an illimitable removal power.

Early on, it became "settled and well understood" that presidents have inherent removal authority, not shared with the Senate or dependent on legislation. *Hennen*, 38 U.S. at 259.  But despite the acceptance of removal authority "as a general matter," *Free Enter. Fund*, 561 U.S. at 513, it was always understood that Congress has some leeway to limit this implied authority.

Congress started doing so in the nineteenth century.  And until recently, the only removal limits judicially invalidated were quite different from the one at issue here.  They effectively prevented removals *entirely*, either by requiring congressional consent, *see Myers v. United States*, 272 U.S. 52, 107 (1926); *Bowsher v. Synar*, 478 U.S. 714, 726 (1986), or by stacking multiple layers of tenure, *see Free Enter. Fund*, 561 U.S. at 486.  While *Seila Law* clarified that "other innovative intrusions" can also violate Article II, 140 S. Ct. at 2205, this is plainly an area where doctrinal development is "liquidat[ing] & settl[ing] the meaning" of the Constitution, *Noel Canning*, 573 U.S. at 525 (quotation marks omitted).  And that only reinforces the importance here of "[l]ong settled and established practice." *Id.* at 524 (quotation marks omitted).

**A.**  The Constitution's text anticipates that Congress would "by Law" create "Departments" and "Officers," U.S. Const. art. II, § 2, but it specifies little about their relationship to the president.  That was no accident: the Framers rejected a plan to delineate in the Constitution the duties of specific department heads who

would serve "during pleasure." 2 *Records of the Federal Convention of 1787*, at 335-36 (Max Farrand ed., 1911).

Instead, the Framers gave Congress discretion over the manner in which "all" the federal government's powers would be "carr[ied] into Execution." U.S. Const. art. I, § 8, cl. 18. And "the constitution makes no mention of any power of removal by the executive of any officers whatsoever." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531 (1833).

At the Founding, there was no consensus that "executive" power necessarily entailed removal authority. *See* Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725, 1790 (1996). Removal authority was not "an inherent attribute of the 'executive power' as it was understood in England." Daniel D. Birk, *Interrogating the Historical Basis for A Unitary Executive*, 73 Stan. L. Rev. 175, 182 (2021). Nor in Founding-era state governments, where removal authority was typically "lodged in the Legislatures or in the courts." *Myers*, 272 U.S. at 118.

**B.** Because "[t]he Constitution is silent with respect to the power of removal," *Hennen*, 38 U.S. at 258, the issue came to the fore when Congress created the federal government's first departments. But the ensuing "Decision of 1789" addressed only who, if anyone, possesses inherent removal power—not the extent to which Congress may condition that power.

25

The "real point which was considered and decided" was whether the Senate's role in approving appointments also gave it "part of the removing power." *Myers*, 272 U.S. at 119; *see Hennen*, 38 U.S. at 259. As Congress considered legislation establishing a Foreign Affairs Secretary, disagreement arose about whether to declare that the president could remove the Secretary from office. *See* David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161, 196-201 (1995). Views differed about whether the Constitution gave inherent removal power to the president, the Senate, both, or neither. *Id.*; *see Hennen*, 38 U.S. at 233. The final legislation obliquely signaled that the president could remove the Secretary, but without specifying whether this power was statutory or constitutional. *See* Act of July 27, 1789, ch. 4, § 2, 1 Stat. 28, 29. Congress thus "left presidential removal to shadowy implication." Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1052 (2006).

In short, the episode established only that "the constitution vested the power of removal in the President alone," not jointly with the Senate. 1 Annals of Cong. 398 (Rep. Vining) (1789). Requiring the Senate's consent could prevent presidents from firing officers who failed to execute the law faithfully. *See id.* at 395, 515-16 (Rep. Madison).

Whether Congress could limit removal in other ways was "never really contested," because the debate focused on where the removal power was lodged, not on Congress's authority to "modify or abridge" it.  Prakash, *supra*, at 1072. Indeed, Madison remarked that while his belief in inherent presidential removal authority prevailed, it "is subject to various modifications, by the power of the Legislature."  Letter from James Madison to Edmund Pendleton, *Founders Online* (June 21, 1789), https://founders.archives.gov/documents/Madison/01-12-02-0152; *accord The Federalist No. 39*, at 242 (Madison) (Clinton Rossiter ed., 1961) ("The tenure of the ministerial offices generally will be a subject of legal regulation[.]").

The Decision of 1789, therefore, "did not endorse the view that Congress lacked authority to modify the Constitution's grant of removal power to the President."  Prakash, *supra*, at 1073.

**C.**  In the following decades, Congress's power to modify the president's removal authority remained widely accepted.  As the Supreme Court put it, only those offices "the tenure of which is not . . . limited by law" are held "subject to removal at pleasure."  *Hennen*, 38 U.S. at 259; *see id.* (removal power is "incident to the power of appointment" only "[i]n the absence of . . . statutory regulation").  James Kent explained that the Decision of 1789 applied only to officers "whose term of duration is not specifically declared," 1 *Commentaries on American Law* 289 (1826), and Joseph Story likewise wrote that the Decision did not address

27

"whether congress can give any duration of office . . . not subject to the exercise of this power of removal," Story, *supra*, § 1531; *see id.* (executive officers "must hold their offices during pleasure, unless congress shall have given some other duration to their office").

Consistent with that understanding, when Congress set fixed terms for various federal officers, Congress deemed it necessary to specify that they "shall be removable from office at pleasure." Act of May 15, 1820, ch. 102, § 1, 3 Stat. 582, 582. That caveat would have been unnecessary if the Constitution already mandated removal at pleasure. But the president's general removal authority "was not regarded . . . as embracing officers with fixed term[s]." Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353, 379 (1927).

In the second half of the nineteenth century, Congress imposed a variety of removal restrictions. When disputes arose, the Supreme Court resolved them as statutory matters, *e.g.*, *McAllister v. United States*, 141 U.S. 174 (1891); *Shurtleff v. United States*, 189 U.S. 311 (1903), expressly declining to address "the constitutional power of the president in his discretion to remove officials during the[ir] term[s]," *Parsons v. United States*, 167 U.S. 324, 334 (1897).

Not until *Myers* did the Court firmly establish the president's removal authority, rejecting a requirement of Senate approval because it could make it

"impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed."  272 U.S. at 164.  But in contrast, the Court upheld good-cause tenure for the leaders of multimember expert agencies less than ten years later.  *Humphrey's Ex'r*, 295 U.S. at 626.  It has done so ever since.  *See Free Enter. Fund*, 561 U.S. at 509 (curing constitutional defect by subjecting multimember body to "a single level of good-cause tenure"); *Seila Law*, 140 S. Ct. at 2211 (inviting Congress to preserve removal limits by "converting the CFPB into a multimember agency").

## CONCLUSION

For the foregoing reasons, this Court should hold that the FTC's structure is constitutional.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
J. Alexander Rowell
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: August 1, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of August, 2023, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: August 1, 2023

*/s/ Brianne J. Gorod*
Brianne J. Gorod

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: August 1, 2023.

*/s/ Brianne J. Gorod*
Brianne J. Gorod