No. 23-60167

IN THE

# United States Court of Appeals
## FOR THE FIFTH CIRCUIT

ILLUMINA, INC. AND GRAIL, INC.,

Petitioners,

v.

FEDERAL TRADE COMMISSION,

Respondent.

PETITION FOR REVIEW OF AN
ORDER OF THE FEDERAL TRADE COMMISSION

---

**Brief of *Amicus Curiae* Open Markets Institute in Support of Respondent**

---

TARA PINCOCK
SANDEEP VAHEESAN
OPEN MARKETS INSTITUTE
655 15th St NW, Suite 310
Washington, DC 20005

KIRK COOPER
   *Counsel of Record*
COOPER APPEALS, P.L.L.C.
10420 Montwood Drive
Suite N-405
El Paso, Texas 79935
915-289-8282
kirk@cooperappeals.com

**Corporate Disclosure Statement**

As required by Federal Rule of Appellate Procedure 26.1, *amicus curiae* Open Markets Institute certifies that it is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

**Supplemental Certificate of Interested Parties**

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation. In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and amicus briefs filed in this case.

DATED: August 1, 2023

Kirk Cooper

*Counsel for Amicus Curiae*

i

# TABLE OF CONTENTS

Corporate Disclosure Statement ........................................................... i

Supplemental Certificate of Interested Parties ............................... i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF THE *AMICUS CURIAE* ........................................... 1

INTRODUCTION ................................................................................. 3

SUMMARY OF ARGUMENT ............................................................. 5

ARGUMENT ......................................................................................... 8

   I.  **Vertical Mergers Can Inflict Serious Harm on Competitors and Consumers** .................................................................................... 8

  II.   **Congress Designed the Clayton Act to Prohibit Harmful Mergers in Their Incipiency—A Standard that the FTC Satisfied Here** ................ 14

  III.  **The Supreme Court Has Rejected an Efficiencies Defense for Presumptively Illegal Mergers** ..................................................... 23

CONCLUSION ..................................................................................... 31

CERTIFICATE OF SERVICE ........................................................... 33

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ................. 34

# TABLE OF AUTHORITIES

## Cases

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ................................ passim

*Chicago Bridge & Iron Co.v. FTC*, 534 F.3d 410 (5th Cir. 2008) .................. 14, 17

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ....................... 10, 20, 27, 29

*Fruehauf Corp. v. FTC*, 603 F.2d 345 (2d Cir. 1979) ................................... passim

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ................................ 5, 8, 30

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ....... 17, 28, 30

*FTC v. Tenet Health Care Corp.*, 186 F.3d 1045 (8th Cir. 1999) .......................... 29

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) ........................... 29, 30

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) ................................. 17

*Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208 (11th Cir. 2012) ......................... 17, 22

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014) ............... 29, 30

*RSR Corp. v. FTC*, 602 F.2d 1317 (9th Cir. 1979) ............................................... 28

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. Saint Luke's Health Sys., Ltd.*, 778
    F.3d 775 (9th Cir. 2015) ......................................................... 18, 28, 30

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ............................. 22

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ............... 28, 29, 30

*United States v. AT & T Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018) ......................5

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) ........................5, 19

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990) ...................21

*United States v. Brown Shoe Co.*, 179 F. Supp. 721 (E.D. Mo. 1959) .................26

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) ...............22

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948)...........................9

*United States v. Phillipsburg Nat'l Bank & Tr. Co.*, 399 U.S. 350 (1970) ............24

*United States v. Von's Grocery Co.*, 384 U.S. 270 (1966)............................... 15, 29

**Statutes**

15 U.S.C. § 13(a) ...............................................................................................23

15 U.S.C. § 18................................................................................................ 5, 8, 19

**Legislative Materials**

S. Rep. No. 81-1775 (1950) ............................................................................ 19, 20

**Other Authorities**

6 The Oxford English Dictionary (1961 reprt.) (1933).....................................20

Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1 (1984) .........26

Janusz A. Ordover, Garth Saloner, & Steven C. Salop, *Equilibrium Vertical Foreclosure*, 127 Am. Econ. Rev. 127 (1990).......................................................12

Melissa A. Schilling, *Potential Sources of Value from Mergers and Their Indicators*, 63 Antitrust Bull. 183 (2018)............................................................31

Michael H. Riordan, *Competitive Effects of Vertical Integration*, *in* Handbook of Antitrust Economics (Paolo Buccirossi ed., 2008) ......................................9

Nancy L. Rose & Jonathan Sallet, *The Dichotomous Treatment of Efficiencies in Horizontal Mergers: Too Much? Too Little? Getting It Right*, 168 U. Penn. L. Rev. 1941 (2020)................................................................................................30

Paul L. Joskow & Roger G. Noll, *The Bell Doctrine, Applications in Telecommunications, Electricity, and Other Network Industries*, 51 Stan. L. Rev. 1249 (1999)..................................................................................................9

Robert H. Bork, The Antitrust Paradox: A Policy at War with Itself 124 (1978)....................................................................................................................26

Robert H. Lande, *Textualism as an Ally of Antitrust Enforcement: Examples from Merger and Monopolization Law*, 2023 Utah L. Rev. 813 (2023)............20

Rudolph J.R. Peritz, Competition Policy in America: History, Rhetoric, Law 198 (rev. ed. 1996) ...........................................................................................15

Steven C. Salop, *Invigorating Vertical Merger Enforcement*, 127 Yale L.J. 1962 (2018)........................................................................................................ 12, 13

## INTEREST OF THE *AMICUS CURIAE*[1]

The Open Markets Institute is a non-profit organization dedicated to promoting fair markets. It does not accept any funding or donations from for-profit corporations. Its mission is to safeguard our political economy from concentrations of private power that undermine fair competition and threaten liberty, democracy, and prosperity. The Open Markets Institute regularly provides expertise on antitrust law and competition policy to Congress, journalists, and other members of the public. The vigorous enforcement of the antitrust laws against corporate mergers and unfair competitive practices is essential to protecting the U.S. economy and democracy from monopoly and oligopoly.

The Open Markets Institute seeks to file a separate brief to provide its distinctive perspective on the economic, legal, and other public issues implicated in the appeal. Its brief presents the economic harms from vertical mergers in general and the law and policy behind the Clayton Act's

---

[1] No counsel for any party authored this brief in whole or in part. Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission. All parties have consented to the filing of the brief.

incipiency standard. It also explains that the reasonable probability standard

in merger cases advances the Act's preventative purpose.

# INTRODUCTION

The issue with Illumina, Inc.'s (Illumina) acquisition of Grail, Inc. (Grail) is simple: a dominant firm should not be permitted to acquire another company when it controls a critical input on which the target company and its rivals depend.

Following the acquisition, the now-vertically integrated dominant firm can use the critical input as a competitive weapon, withholding it entirely from independent downstream rivals or offering it only on discriminatory terms. Through such unfair competitive tactics, the dominant firm can hobble downstream rivals. And by weakening or foreclosing these rivals, the dominant firm can increase its own pricing power and reduce or eliminate the pressure to compete through product improvements and innovations in the downstream market. The FTC correctly recognized that this is a type of merger prohibited by the Clayton Act. This Court should affirm the FTC's decision.

In the market for cancer testing here, such unfair exclusion can translate into not only higher prices for patients but the loss of lifesaving

technological advances over time. The FTC properly found that Illumina's acquisition of Grail fundamentally changed the dynamics in the market for multi-cancer early detection (MCED) tests. While developers of MCED tests were reliant on Illumina for next-generation sequencing platforms and consumables prior to the acquisition, they now also compete head-to-head with Illumina. With a 100% equity stake in Grail, Illumina has a powerful incentive to favor Grail over independent competitors in the MCED market. If Grail wins the race, Illumina will obtain a monopolistic position in the MCED market and potentially earn millions of dollars in additional profits. As such, the acquisition gives Illumina both the ability and the incentive to foreclose rivals in the MCED market.

Instead of Grail continuing to compete in the MCED market through continued innovation, the combined Illumina-Grail can compete by withholding critical inputs from rivals or supplying them on unfair terms. By impeding the growth and success of rivals in the MCED market in violation of antitrust law, Illumina may suppress beneficial innovation and rob patients of lifesaving improvements in cancer detection.

## SUMMARY OF ARGUMENT

The FTC acted within the bounds of authority granted to it by the Clayton Act. This Court should affirm for three reasons.

*First*, contrary to Illumina's argument, not all vertical mergers are benign. A vertical merger that puts the integrated firm in a position in which it can engage in exclusionary conduct by depriving non-integrated downstream rivals of key inputs violates the Clayton Act's prohibition on acquisitions that may substantially lessen competition.[2] Such mergers "are not invariably innocuous, but instead can generate competitive harm in certain circumstances."[3] The consolidation of Illumina and Grail is one such example of a harmful vertical merger. Following a vertical merger, a dominant firm like Illumina can use its control of critical inputs to subvert the competitive position of downstream rivals, and by doing so, secure

---

[2] *Fruehauf Corp. v. FTC*, 603 F.2d 345, 353-54 (2d Cir. 1979); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001) (quoting 15 U.S.C. § 18).

[3] *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 194 (D.D.C. 2018), *aff'd* 916 F.3d 1029 (D.C. Cir. 2019) (cleaned up and internal quotations omitted).

5

greater pricing power and relieve the competitive pressure on itself to make product improvements and undertake research and development.

*Second*, when a vertical merger violative of the Clayton Act appears on the horizon, the FTC may intervene prophylactically based on a predictive assessment that a reasonable likelihood of harm is incipient, and not necessarily based on a finding that harm is certain or has already occurred. This prophylactic application distinguishes the Clayton Act from the Sherman Act; indeed, Congress passed the Clayton Act to remedy a perceived shortfall in the Sherman Act. Unlike the Sherman Act, the Clayton Act stops mergers before they injure the public and does not require enforcers to wait until mergers have inflicted harm on competitors, customers, and suppliers. Accordingly, plaintiffs challenging a vertical merger only need to establish a reasonable probability that the consolidation will substantially lessen competition. If the government shows a reasonable probability of foreclosure following a vertical merger, it makes out a *prima facie* case. The FTC did so here. There is no reversible error on this basis.

***Third***, the U.S. Supreme Court has repeatedly rejected an "efficiencies" defense to Section 7 as being inconsistent with the text of the law and congressional intent. This Court must apply this line of precedent, which other sister courts have recognized as being still viable and binding, in resolving the case at hand. Efficiencies cannot excuse a presumptively illegal merger. And the Supreme Court has recognized that recognition of an efficiencies defense would lead the judiciary to stray beyond its usual function and undertake "[a] value choice of such magnitude . . . beyond the ordinary limits of judicial competence" that would lead to a "reckoning of social or economic debits and credits."[4] Courts are not well-suited to engage in a social cost-benefit analysis in assessing the legality of a merger. Deference to the FTC is warranted.

---

[4] *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 371 (1963).

7

## ARGUMENT

### I.    Vertical Mergers Can Inflict Serious Harm on Competitors and Consumers

Section 7 of the Clayton Act "prohibits acquisitions, including mergers, 'where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition *may be* substantially to lessen competition.'" See *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001) (quoting 15 U.S.C. § 18).

Vertical mergers are an "[e]conomic arrangement[] between companies standing in a supplier-customer relationship[.]" *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962). Mergers between a dominant firm in one market and a firm in a connected market can inflict serious harm on competitors, customers, and end-use consumers. Indeed, in some markets in which one segment is under monopolistic or oligopolistic control, U.S. competition policy has required vertical separation between the dominated segment and downstream and upstream businesses. *See, e.g.*, Paul L. Joskow & Roger G. Noll, *The Bell Doctrine, Applications in Telecommunications, Electricity, and Other Network Industries*, 51 Stan. L. Rev. 1249, 1254-57 (1999)

(discussing history of vertical separation in various industries); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 152-53 (1948) (requiring certain motion picture companies to divest movie theaters).

The reason for this policy is not hard to divine: vertical mergers involving dominant firms can lead to myriad harms to competitors, consumers, and the public, including but not limited to, unfair exclusion, higher prices, decreased product quality, and reduced innovation. *See* Michael H. Riordan, *Competitive Effects of Vertical Integration*, *in* Handbook of Antitrust Economics 146-61 (Paolo Buccirossi ed., 2008).

In 1962, the Supreme Court in *Brown Shoe Co. v. United States* decided its first merger case interpreting the amended Clayton Act. *See Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). Like this case, *Brown Shoe* involved a vertical merger. Chief Justice Warren, in writing for the Court, specifically identified mergers and acquisitions similar to Illumina's acquisition of Grail as potentially problematic because these types of deals "may disrupt and injure competition when those independent customers of the supplier who are in competition with the merging customer, are forced to either stop

9

handling the supplier's lines, thereby jeopardizing the goodwill they have developed, or to retain the supplier's lines, thereby forcing them into competition with their own supplier." *Id.* at 324 n.40.

A simple hypothetical shows why vertical mergers are a cause for concern and restricted by the law. Assume that all car manufacturers used the same patented brake pad in their braking system and their systems were designed to use that brake pad only. Switching to another brake pad would (1) require a complete redesign of the braking system, (2) cost millions of dollars to implement, and (3) delay production of new vehicles by several months or longer. Car manufacturers have no reason or desire to switch because the universal brake pad is considered the gold standard in the industry—the safest of the safe.

If Ford Motor Company seeks to acquire the company that makes the brake pads and owns all the relevant patents,[5] the acquisition would give Ford complete control over the price, production, and delivery of brake pads

---

[5] *See Ford Motor Co. v. United States*, 405 U.S. 562, 566 (1972) (discussing similar fact pattern with Ford acquisition of a manufacturer in the spark plug market).

to its rivals. With the brake pad manufacturer and its intellectual property under its control, Ford would have an important competitive weapon in the downstream market for cars. Ford's management might promise—scout's honor—that they would never interfere with their rivals' ability to buy brake pads at a reasonable price.

But when hundreds of millions of dollars or more are at stake, how much and for how long can that promise be trusted? In addition to raising prices of brake pads, the acquiring company could interfere with its rivals in many other ways. It could delay shipping of brake pads and interfere with production schedules or ship inferior products and thereby reduce the quality of brakes on rivals' vehicles. *See Fruehauf Corp. v. FTC*, 603 F.2d 345, 353-54 (2d Cir. 1979) (describing some foreclosure strategies and tactics that a firm could use following a vertical acquisition).

Through these practices, Ford would give its own vehicles a significant—and unfair—competitive advantage against rival vehicle manufacturers. By hobbling its rivals, Ford would acquire greater pricing power and reduce pressure on itself to compete by improving the quality

and safety of its vehicles. In an extreme case, if Ford withholds brake pads from rival automakers and forces them to redesign their braking system, Ford could enjoy monopolistic control of the vehicle market for many months or more. By acquiring the brake pad manufacturer, Ford would have a major competitive weapon at its disposal—a weapon it could deploy to the detriment of rival auto manufacturers and ultimately purchasers of cars, trucks, and vans.

As the hypothetical shows, exclusionary conduct through an input-foreclosure strategy is one of the primary unfair competitive threats posed by vertical mergers. *See* Janusz A. Ordover, Garth Saloner, & Steven C. Salop, *Equilibrium Vertical Foreclosure*, 80 Am. Econ. Rev. 127, 127-28 (1990). A vertical merger puts the integrated firm in a position in which it can engage in exclusionary conduct by depriving non-integrated downstream rivals of key inputs. An input-foreclosure strategy "entails the upstream merging firm raising prices or refusing to sell its critical input to one or more actual or potential rivals of the downstream merging firm." Steven C. Salop, *Invigorating Vertical Merger Enforcement*, 127 Yale L.J. 1962, 1977 (2018). This

12

type of foreclosure can depress rivals' output, reduce the quality of their products, impede their ability to expand, and even force them to exit a market. *Id.* at 1969-70.

In this case, similar to the Ford hypothetical above, developers of multi-cancer early detection (MCED) tests are now in a position where they have to buy critical supplies from a rival. Prior to the acquisition, they were not both dependent on, and competing with, Illumina. MCED test developers are unable to switch to another supplier because "substitute platforms are inadequate in throughput, accuracy, cost, level of development, risks associated with adoption, or a combination of those factors." R213-14. Illumina has complete control over the price, production, and delivery of its platforms and core consumables. This puts Illumina in a position in which it can implement an input-foreclosure strategy, thereby raising MCED test developers' costs or reducing their quality.

While MCED test developers were reliant on Illumina prior to the acquisition, they now also compete head-to-head with Illumina. Given its full equity stake in Grail, Illumina has a powerful incentive to favor Grail

over independent competitors in the MCED test market. If Grail wins the race over emerging rivals in their efforts to develop and commercialize MCED tests, Illumina will obtain a monopolistic position in the MCED test market and potentially earn millions of dollars in additional profits. As such, the acquisition gives Illumina both the ability and the incentive to foreclose rivals in the MCED market. Instead of Grail continuing to compete in the MCED market through continued innovation, the combined Illumina-Grail may now compete by withholding critical inputs from rivals or supplying them on discriminatory terms. By impeding the growth and success of rivals in the MCED test market, Illumina may rob patients of lifesaving technological advances.

## II.    Congress Designed the Clayton Act to Prohibit Harmful Mergers in Their Incipiency—A Standard that the FTC Satisfied Here

The Clayton Act is concerned with probabilities, not certainties, of harm from a merger. This Court has recognized as much. *See Chicago Bridge & Iron Co.v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008). If courts required plaintiffs such as the FTC to establish a certainty of harm, they would erase critical

differences between the Clayton Act and the Sherman Act and override Congress' policy judgments. As the Supreme Court observed: "[T]he legislative history of s[ection] 7 indicates clearly that the tests for measuring the legality of any particular economic arrangement under the Clayton Act are to be less stringent than those used in applying the Sherman Act." *Brown Shoe*, 370 U.S. at 328-29.

Congress enacted the Clayton Act to prohibit harmful mergers in their incipiency and to remedy what many members perceived as deficiencies in the Sherman Act. The Supreme Court appreciated this legislative genesis of the Clayton Act: "The Sherman Act failed to protect the smaller businessmen from elimination through the monopolistic pressures of large combinations which used mergers to grow ever more powerful." *United States v. Von's Grocery Co.*, 384 U.S. 270, 274-75 (1966).

When Congress amended the Act in 1950, it broadened the scope of the law's anti-merger provisions and prohibited vertical mergers that may substantially lessen competition. *See* Rudolph J.R. Peritz, Competition Policy in America: History, Rhetoric, Law 198 (rev. ed. 1996). Congress' inclusion

of the word "may" in the original and amended statute reveals a conscious decision to enact a prophylactic antitrust statute. Unlike the Sherman Act, the Clayton Act stops mergers before they injure the public, not after they have inflicted harm on competitors, customers, and suppliers.

After the Clayton Act was amended in 1950, the Supreme Court in *Brown Shoe* engaged in a careful examination of the Act's purpose and reviewed the legislative history. The Court noted that the Act was intended to "arrest[] mergers at a time when the trend to a lessening of competition in a line of commerce [is] still in its incipiency." *Brown Shoe*, 370 U.S. at 317. Since *Brown Shoe*, the Supreme Court has repeatedly reaffirmed the Clayton Act's incipiency standard and its core objective to stop mergers that may harm rivals and consumers. In 1963, the Court reiterated that Section 7 was "intended to arrest anticompetitive tendencies in their incipiency." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362 (1963); *see also FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967) ("[T]here is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action."). In its most recent merger decision on the merits, the Supreme Court affirmed

16

the "reasonable likelihood" standard of the Clayton Act. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622 (1974).

As Congress intended, the incipiency standard ensures that the government and other plaintiffs can stop potentially harmful mergers before their ill effects become cognizable. These adverse effects include unfair exclusion of competitors, higher short-term prices and reduced choice, innovation, and quality. This Court has recognized and applied the incipiency standard. *See Chicago Bridge & Iron Co.*, 534 F.3d at 423.

Judge Posner, writing for the Seventh Circuit, articulated the incipiency standard as follows: "Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future." *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986). *See also Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1215 (11th Cir. 2012) ("[T]he Clayton Act is about probabilities and not certainties."); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016) (same); *Saint*

17

*Alphonsus Med. Ctr.-Nampa Inc. v. Saint Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (same).

As a practical matter, Congress had no choice but to emphasize probabilities because prediction is a fraught enterprise. The congressional supporters of the Clayton Act recognized that "that neither the Commission nor the courts should be charged with possession of powers of prevision that no one else has achieved." *Fruehauf*, 603 F.2d at 351.

Under the Clayton Act, plaintiffs challenging a vertical merger only need to show a reasonable probability that the consolidation will substantially lessen competition. If the plaintiff shows a reasonable probability of foreclosure following a vertical merger, it makes out a *prima facie* case. As the *Brown Shoe* Court wrote, the Clayton Act, as an incipiency statute, concerns "probabilities, not . . . certainties." *Brown Shoe*, 370 U.S. at 323. Imposing a higher legal standard on plaintiffs would frustrate "the congressional policy of thwarting [harmful] practices in their incipiency." *Procter & Gamble*, 386 U.S. at 577.

Recently, at least one court has attempted to raise the legal burden on plaintiffs challenging mergers under the Clayton Act. Per Section 7, acquisitions are prohibited "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition *may be* substantially to lessen competition." 15 U.S.C. § 18 (emphasis added). Despite the clear language of the statute, one court of appeals held that the plaintiff must show through evidence that the merger or acquisition "is *likely* to substantially lessen competition." *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1037 (D.C. Cir. 2019) (emphasis added).

This Court should decline to adopt this heightened burden, since it is atextual and conflicts with Supreme Court precedent. Contrary to what Illumina and Grail contend, "may be" and "likely" are not synonyms. Congress, intended the words "may be" to "not apply to mere possibilities but only to the reasonable probability of the [proscribed] effect." S. Rep. No. 81-1775, at 6 (1950). The Supreme Court recognized the meaning of reasonable probability:

> The concept of reasonable probability conveyed by these words
> is a necessary element in any statute which seeks to arrest

restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act. A requirement of certainty and actuality of injury to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints.

*Ford Motor Co. v. United States*, 405 U.S. 562, 567 n.4 (1972) (quoting S. Rep. No. 81-1775, at 5).

The word "likely," on the other hand, is defined as "that looks as if it would happen, be realized, or prove to be what is alleged or suggested[.]" *Likely*, 6 The Oxford English Dictionary 288 (1961 reprt.) (1933). In other words, by applying "likely" as the standard instead of "may be," plaintiffs must show something more than the reasonable probability of harm required by the law. *Fruehauf*, 603 F.2d at 351. As one leading antitrust scholar wrote in his textualist analysis of the Clayton Act: "The word 'may' should *not* . . . limit the law's prohibitions to mergers that 'are more likely than not' to substantially lessen competition. A low, modest probability should be enough." Robert H. Lande, *Textualism as an Ally of Antitrust Enforcement: Examples from Merger and Monopolization Law*, 2023 Utah L. Rev. 813, 830 (2023) (emphasis added).

In *AT&T*, the D.C. Circuit effectively rewrote the text and moved the Clayton Act's legal standard closer to what the Sherman Act requires.[6] One court of appeals recognized the critical difference between the two statutes: "Requiring a plaintiff to prove that substantial lessening of competition is inevitable would thwart the express intent of Congress to nip anticompetitive practices in the bud before they blossom into a Sherman Act restraint of trade[.]" *Fruehauf*, 603 F.2d at 351. The D.C. Circuit overrode congressional judgment in enacting the Clayton Act, which "creates a relatively expansive definition of antitrust liability[.]" *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990).

This burden creep should be rejected unambiguously. This Court should reaffirm that plaintiffs in anti-merger cases only need to show a reasonable probability of harm.

The FTC's decision against Illumina's acquisition of Grail more than satisfies the reasonable probability standard. The FTC established that

---

[6] In an earlier decision, the D.C. Circuit went even further and replaced "may" in Section 7 of the Clayton Act with "will." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982, 992 (D.C. Cir. 1990). Such statutory amendments are a province of Congress, not the courts.

Illumina is a monopolist in the market for next-generation sequencing—a critical input for makers of MCED tests. Following the acquisition of Grail in its entirety, Illumina obtained the ability and the incentive to raise prices of its essential next-generation sequencing platforms and consumables to current and would-be competitors of Grail or withhold them from these rivals entirely. The facts here may even warrant application of a per se prohibition, given that "the share of the market foreclosed reaches monopoly proportions." *Fruehauf*, 603 F.2d at 352. Through this vertical merger, Illumina acquired a major competitive advantage in the market for MCED tests and possesses the power to foreclose and hamper competitors to Grail, to their detriment and ultimately to the detriment of patients. [7]

---

[7] Illumina contends that its open offer commitment to supply Grail's competitors with platforms and consumables fully resolved the concerns of the FTC. Once the FTC determines a merger violates the Clayton Act, however, it, much like a district court, has broad discretion to fashion appropriate remedies. *Polypore*, 686 F.3d at 1218-19. Divestitures such as the one ordered by the FTC are a conventional and sensible remedy for violations of Section 7. *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 330-31 (1961).

According to courts that have addressed the question of remedies proposed by the merging parties, the burden of showing that the open offer completely addresses the FTC's foreclosure concerns is on Illumina. *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017).

### III. The Supreme Court Has Rejected an Efficiencies Defense for Presumptively Illegal Mergers.

In a series of decisions, the Supreme Court rejected an efficiencies defense for presumptively illegal mergers. It did so based on textualist and institutional competence grounds. Several courts of appeals have recognized this controlling Supreme Court precedent, and none have excused an otherwise illegal merger based on enhanced efficiency.

In Section 7 of the Clayton Act, Congress could have adopted an efficiencies defense for illegal mergers—but did not. Lande, *Textualism as an Ally of Antitrust Enforcement*, 2023 Utah L. Rev. at 833. It had two opportunities to do so: once in 1914, when it enacted the Clayton Act; and again in 1950, when it amended the law. By 1950, Congress was certainly familiar with the inclusion of efficiency and cost-justification defenses. In contrast to Section 7, in Section 2 of the Clayton Act, Congress included a cost-justification defense when it enacted the law in 1914 and refined the defense when it amended the law in the Robinson-Patman Act of 1936. 15 U.S.C. § 13(a). Tellingly, Congress included no parallel provision in Section 7.

23

The Supreme Court relied on the text of Section 7 of the Clayton Act to rule out an efficiencies defense for mergers. In *Brown Shoe*, the Court confronted the possibility of an illegal merger that offered the promise of operational efficiencies. The Court unambiguously rejected an efficiencies defense and concluded that Congress "resolved these competing considerations in favor of decentralization." *Brown Shoe*, 370 U.S. at 344. One year later, two merging banks attempted to justify their presumptively illegal merger based on purported benefits to the public. Again, the Supreme Court said no and concluded that "Congress determined to preserve our traditionally competitive economy . . . [and] therefore proscribed anticompetitive mergers, the benign and the malignant alike, fully aware, we must assume, that some price might have to be paid." *Philadelphia Nat'l Bank*, 374 U.S. at 371.[8]

A few years later, the Court affirmed that an efficiencies defense was not available under Section 7 of the Clayton Act. In deciding the legality of a

---

[8] In a bank merger case in 1970, the Court again rejected the benefits from scale as a defense to an illegal merger under the Clayton Act. *United States v. Phillipsburg Nat'l Bank & Tr. Co.*, 399 U.S. 350, 367 (1970).

product-extension merger, the Court held that "[p]ossible economies cannot be used as a defense to illegality." *Procter & Gamble*, 386 U.S. at 580. It drew on the text and legislative debates of the Clayton Act, writing, "Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition." *Id.*

In addition to the text and purpose of the Clayton Act, the Court also relied on institutional considerations in ruling out an efficiencies defense for mergers. This was articulated in *Philadelphia National Bank*. The Court understood that it was not well-suited to perform a social cost-benefit analysis in assessing the legality of a merger. Adoption of an efficiencies defense would require the federal courts to undertake a "reckoning of social or economic debits and credits." *Philadelphia Nat'l Bank*, 374 U.S. at 371. Given the complicated issues at stake, the majority in *Philadelphia National Bank* wrote, "A value choice of such magnitude is beyond the ordinary limits of judicial competence[.]" *Id.* Then-Professor Robert Bork also opposed an efficiencies defense in merger law, citing the institutional limitations of the judiciary. *See* Robert H. Bork, The Antitrust Paradox: A Policy at War with

Itself 124 (1978); *see also* Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 39 (1984) ("[N]either judges nor juries are particularly good at handling complex economic arguments, . . .).

In these landmark decisions, the Court confronted different types of mergers with different proffered efficiencies—and rejected an efficiencies defense in all of them. *Brown Shoe* involved a merger with horizontal and vertical elements and economies of scale and scope in advertising and marketing. *Brown Shoe*, 370 U.S. at 323-39; *United States v. Brown Shoe Co.*, 179 F. Supp. 721, 738 (E.D. Mo. 1959). In *Philadelphia National Bank*, the Court examined a horizontal merger in which two competing banks attempted to justify their consolidation by asserting that post-merger they would be better able to compete against banks in New York and to attract business and investment to Philadelphia. *Philadelphia Nat'l Bank*, 374 U.S. at 370-71. And *Procter & Gamble* concerned a conglomerate merger that offered the possibility of cost savings in advertising household bleach. *Procter & Gamble*, 386 U.S. at 574-75. These distinct fact patterns and efficiency claims foreclose the notion that the Supreme Court only said no to certain efficiency claims

involving certain types of mergers. The Court said no to an efficiencies defense. Full stop.

In rejecting an efficiencies defense, the Supreme Court did not discourage nor seek to halt business growth. Instead, the Court understood that mergers are not the only means of firm expansion. They can hire more workers, expand existing plants and factories, and build new production capacity. Banks could expand "by opening new offices rather than acquiring existing ones." *Philadelphia Nat'l Bank*, 374 U.S. at 370. Internal expansion is legal under Section 7 and a method of growth in the same market or entry into a new market. *Ford*, 405 U.S. at 567-68. Indeed, anti-merger law, at least implicitly, is a method of encouraging internal expansion. The Supreme Court noted that "surely one premise of an antimerger statute such as s 7 [of the Clayton Act] is that corporate growth by internal expansion is socially preferable to growth by acquisition." *Philadelphia Nat'l Bank*, 374 U.S. at 370 The Court appreciated the general superiority of internal expansion, relative to mergers, as measured by investment, jobs, and output. *Brown Shoe*, 370 U.S. at 345 n.72.

While the relevant Supreme Court precedents date from the 1960s, several courts of appeals have recognized they are still the law. In 2016, the Third Circuit, relying on the text of the Clayton Act and Supreme Court precedent, stated, "we are skeptical that such an efficiencies defense even exists." *Penn State Hershey*, 838 F.3d at 348. In a similar spirit, the Ninth Circuit wrote: "We remain skeptical about the efficiencies defense in general and about its scope in particular." *Saint Alphonsus*, 778 F.3d at 790. In a prior decision, the court was even more explicit: "[The acquirer] argues that the merger can be justified because it allows greater efficiency of operation. This argument has been rejected repeatedly." *RSR Corp. v. FTC*, 602 F.2d 1317, 1325 (9th Cir. 1979). The D.C. Circuit described the "clear holding of *Procter & Gamble*" as rejecting an efficiencies defense. *United States v. Anthem, Inc.*, 855 F.3d 345, 354 (D.C. Cir. 2017).

Although courts of appeals "could not overrule Supreme Court precedent," *Id.*, a few circuits have nonetheless entertained an efficiencies defense. To the extent they have done this, they have disregarded controlling Supreme Court case law. While some economists favor the adoption of an

efficiencies defense, the federal courts of appeals are not at liberty to take this step. That is a prerogative of Congress. Two of the courts of appeals failed to consider the relevant case law. The Sixth Circuit reasoned that the Supreme Court's reinterpretations of the Sherman Act and the Copyright Act somehow changed the interpretation of the Clayton Act. *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 571 (6th Cir. 2014). The cases cited by the court "did not involve efficiencies, mergers, or Section 7 of the Clayton Act." *Anthem*, 855 F.3d at 354. Another court, while acknowledging the plain language in the Supreme Court's *Procter & Gamble* decision, cited a treatise and a law review article in an attempt to narrow binding Supreme Court case law. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1222 (11th Cir. 1991).[9]

---

[9] Another court of appeals stated that the merging parties' "efficiencies defense may have been properly rejected by the district court" but then added "the district court should nonetheless have considered evidence of enhanced efficiency in the context of the competitive effects of the merger." *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1055 (8th Cir. 1999).

This incorporation of efficiencies into the competitive analysis disregards the incipiency standard in the Clayton Act and the purpose of the law. As the Supreme Court wrote in a merger case in 1966: "To arrest this 'rising tide' toward concentration into too few hands and to halt the gradual demise of the small businessman, Congress decided to clamp down with vigor on mergers." *Von's*, 384 U.S. at 276. *See also Ford*, 405 U.S. at 569-70 (refusing to permit a merger on the grounds that the acquiree would become "a more vigorous and effective competitor").

Nevertheless, the federal courts of appeals have not excused an illegal merger based on an efficiencies defense. The three courts of appeals that expressed great skepticism about an efficiencies defense nonetheless examined the merging parties' factual support for their efficiencies claims. They unambiguously rejected the defense. *Anthem*, 855 F.3d at 364; *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 722 (D.C. Cir. 2001); *Penn State Hershey*, 838 F.3d 349-50; *Saint Alphonsus*, 778 F.3d at 791-92. Even the courts of appeals most receptive to an efficiencies defense did not permit presumptively illegal mergers based on efficiencies. *ProMedica*, 749 F.3d at 572; *Univ. Health*, 938 F.2d at 1223-24.

These outcomes should not be surprising. Despite the confident theoretical pronouncements of merger proponents, empirical research casts serious doubt on whether mergers typically create operational economies. *See* Nancy L. Rose & Jonathan Sallet, *The Dichotomous Treatment of Efficiencies in Horizontal Mergers: Too Much? Too Little? Getting It Right*, 168 U. Penn. L. Rev. 1941, 1961-67 (2020) (reviewing studies on effects of horizontal mergers). One business scholar examined the empirical research and was

blunt in her assessment: "A considerable body of research concludes that most mergers do not create value for anyone, except perhaps the investment bankers who negotiated the deal." Melissa A. Schilling, *Potential Sources of Value from Mergers and Their Indicators*, 63 Antitrust Bull. 183, 186 (2018).

Regardless of what other courts of appeals have said about the efficiencies defense, the decisions of the Supreme Court are controlling. The Court has been clear that an illegal merger is not excused because of efficiencies. That is the law of the land and should be followed by this Court.

## CONCLUSION

The FTC faithfully applied the Clayton Act to Illumina's acquisition of Grail and concluded the transaction—a vertical merger involving a monopolist—was illegal. Accordingly, this Court should deny the petition for review.

DATED: August 1, 2023                    Respectfully submitted,

KIRK COOPER
   *Counsel of Record*
COOPER APPEALS, P.L.L.C.
10420 Montwood DriveSuite N-404
El Paso, Texas 79935
915-289-8282
kirk@cooperappeals.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused a true and correct copy of the foregoing to be served on counsel of record for all parties via ECF.

Kirk Cooper
*Counsel for Amicus Curiae*

DATED: August 1, 2023

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I am an attorney for *amicus curiae* Open Markets Institute (OMI).

Pursuant to Fed. R. App. P. 32(a), I certify that the foregoing brief of OMI is

in 14-point, proportionately spaced Palatino Linotype font. According to the

word processing application used to draft this brief (Microsoft Word 365),

the brief contains 5,702 words, not including the certificate of interested

parties, table of contents, table of authorities, and this certificate of

compliance.

Kirk Cooper
*Counsel for Amicus Curiae*

DATED: August 1, 2023