No. 23-60167

# In The United States Court of Appeals for the Fifth Circuit

ILLUMINA, INC. AND GRAIL, INC.,
*Petitioners,*

v.

FEDERAL TRADE COMMISSION,
*Respondent.*

Petition for Review from an Order of
the Federal Trade Commission
Agency No. 9401

## BRIEF FOR AMERICAN ECONOMIC LIBERTIES PROJECT AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENTS

Katherine Van Dyck
Lee A. Hepner
AMERICAN ECONOMIC LIBERTIES PROJECT
2001 Pennsylvania Avenue NW, Suite 540
Washington, DC 20006
(202) 904-8101
kvandyck@economicliberties.us

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1— in addition to the persons listed on the certificates of interested persons submitted by Petitioners Illumina, Inc. and Grail, Inc.; Respondent Federal Trade Commission; and the various amici curiae— have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. American Economic Liberties Project, Amicus Curiae

Dated: August 2, 2023

*s/ Katherine Van Dyck*
Katherine Van Dyck
Lee A. Hepner
American Economic Liberties Project
2001 Pennsylvania Avenue NW
Suite 540
Washington, DC 20006
(202) 904-8101
kvandyck@economicliberties.us

Counsel for Amicus Curiae

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................i

TABLE OF AUTHORITIES................................................................ iii

CITATION ABBREVIATIONS ..............................................................vi

INTEREST OF AMICUS ..........................................................................1

SUMMARY OF ARGUMENT ...................................................................2

ARGUMENT ..............................................................................................4

I.     THE CLAYTON ACT IS CONCERNED WITH FUTURE
       MARKET CONDITIONS ...............................................................4

II.    THE R&D MARKET IS A PROPER LINE OF COMMERCE ........8

       A.    The R&D Market for MCED Tests Already Exists ...............9

       B.    The Impact of Innovation on Competition is Widely
             Recognized...........................................................................11

       C.    Future Market Entrants Play An Important Role in
             Competition .........................................................................16

III.   CONCLUSION .............................................................................21

CERTIFICATE OF COMPLIANCE.......................................................22

CERTIFICATE OF SERVICE.................................................................22

# TABLE OF AUTHORITIES

## Cases

*Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572 (Fed. Cir. 1990) ....................................................................... 13

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) ................................... 6

*Brown Shoe v. United* States, 370 U.S. 294 (1962) ................. 2, 4, 5, 8

*Cal. v. Am. Stores Co.*, 495 U.S. 271 (1990) ........................................ 5

*Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028 (C.D. Cal. 2007) ...................................................................................... 13

*DAT Sols., LLC v. Convoy, Inc.*, No. 22-cv-00088, 2023 WL 3058057 (D. Or. Apr. 24, 2023) ...................................................... 13

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ....................... 20

*Fraser v. Major League Soccer, L.L.C.*, 97 F. Supp. 2d 130 (D. Mass. 2000)............................................................................... 9, 10

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ................. 3, 7

*FTC v. PPG Indus., Inc.*, 798 F.2d 1500 (D.C. Cir. 1986) .......... passim

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ............................. 6

*Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861 (Fed. Cir. 1985)........... 13

*Mercantile Texas Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 638 F.2d 1255 (5th Cir. 1981) ...................................................... passim

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015 ................................................................................... 12

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022), *cert. denied sub nom.*, 143 S. Ct. 567 (2023)....................... 12

*Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732 (5th Cir. 2015) ......................................................................... 19

*SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981) ................. 10

*United States v. AlliedSignal Inc.*, No. 99-cv-2959, 2000 WL 33115901 (D.D.C. Mar. 22, 2000) .................................... 14

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) ....................................................................... 12

*United States v. Bos. Sci. Corp.*, 253 F. Supp. 2d 85 (D. Mass. 2003) ....................................................................... 13

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ................................................................... 5, 7

*United States v. El Paso Nat. Gas Co.*, 376 U.S. 651 (1964) .............. 17

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ........... 17

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ........................ 18

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ....................................................................... 17

*United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) .................. 19

*United States v. Penn-Olin Chem. Co.*, 378 U.S. 158 (1964) ............. 18

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ...... 7, 8

*United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001) ................................................................. 19

*Woods Expl. & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286 (5th Cir. 1971) ....................................................... 12

**Administrative Decisions**

*In the Matter of Adobe Sys. Inc., et al.*, 118 F.T.C. 940 (1994) .......... 14

*In the Matter of Am. Home Prod. Corp.*, 119 F.T.C. 217 (1995) ........14

*In the Matter of Amgen Inc., et al.*, 134 F.T.C. 333 (2002) ................14

*In the Matter of Ciba-Geigy Ltd., et al.*, No. 961-0055, 1996 WL 743359 (F.T.C. Dec. 5, 1996) .........................................14

*In the Matter of Roche Holding Ltd., et al.*, 113 F.T.C. 1086 (1990) ......................................................................14

## Statutes

15 U.S.C. § 18 ................................................................2, 5

## Legislative Materials

H.R. Rep. No. 1191, 81st Cong., 1st Sess. 8 (1949) ...............................5

S. Rep. No. 1775, 81st Cong., 2d Sess. (1950) ......................................6

## Other Sources

Prepared Remarks of Federal Trade Commissioner Christine A. Varney, *Competition Policy in Vertical Mergers and Innovation Markets* (Apr. 1995) ......................................................3

Richard J. Gilbert & Steven C. Sunshine, *Incorporating Dynamic Efficiency Concerns in Merger Analysis: The Use of Innovation Market*s, 63 ANTITRUST L.J. 569 (1995) .........................................13

U.S. Dep't of Justice & Fed. Trade Comm'n, *Draft Merger Guidelines* 15 (2023) ......................................................14

U.S. Dep't of Justice, *Vertical Merger Guidelines* (2020) ...................14

# CITATION ABBREVIATIONS

This Brief uses the same abbreviations used in Petitioners' Brief and Respondent's Brief, including the following:

| | |
|---|---|
| Conc. Op. | Concurring Opinion of Commissioner Wilson |
| IDF | Initial Decision Findings of Fact |
| Op. | Opinion of the Commission |
| Pet. Br. | Petitioners' Brief |

# INTEREST OF AMICUS

American Economic Liberties Project ("AELP") is an independent nonprofit research and advocacy organization dedicated to understanding and addressing the problem of concentrated economic power in the United States.[1] AELP organizes and employs a diverse set of leading policy experts in a wide range of areas impacted by concentrated power that include the healthcare industry, private equity, airlines, and the digital marketplace. It advocates for policies that address today's crisis of concentration through legislative efforts and public policy debates. AELP submits this brief because Petitioners are attempting to rewrite the Clayton Act, so it will become blind to the effects of mergers and acquisitions on innovation, research, and development. Our antitrust laws cannot protect competition if merger challenges supported by clear evidence of foreclosure are rejected based on convoluted, burdensome, and unrealistic requirements for market definition that ignore the effects of acquisitions on future market conditions.

---

[1] https://www.economicliberties.us/.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief in whole or part. In addition, no party or party's counsel, and no person other than the amicus curiae, its supporters, or its counsel, contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

Petitioners Illumina, Inc. and Grail, Inc.'s ("Petitioners") criticism of the product market definition adopted by both the full Commission and the administrative law judge ("ALJ")—that it is "unprecedentedly broad and speculative" (Pet. Br. 29)—is wholly inconsistent with the purpose of Section 7 of the Clayton Act, 15 U.S.C. § 18, and ignores how courts and enforcers have interpreted the law from its inception. The Supreme Court told us in its seminal decision in *Brown Shoe v. United States* that Section 7 is forward looking:

> [T]he very wording of [Section] 7 requires a prognosis of the probable future effect of the merger.
>
> ….
>
> It is the probable effect of the merger upon the future as well as the present which the Clayton Act *commands* the courts and the Commission to examine.

370 U.S. 294, 332 (1962) (emphasis added).

Petitioners' claim that the Federal Trade Commission "*invent[ed]* a legally erroneous R&D market", (Pet. Br. 38) (emphasis added), is belied not only by the long history of enforcement focused on protecting innovation and future market conditions. *See infra* Section II.B-C. It is explicitly contradicted by the enforcement prerogatives articulated by counsel for Illumina when she sat as a commissioner at the FTC. As then-Commissioner Varney explained in an uncontroversial set of remarks about vertical merger policy, "it is the Commission's statutory responsibility to consider the possibility, or likelihood, of future anticompetitive effects." Prepared Remarks of Federal Trade Commissioner Christine A. Varney, *Competition Policy in Vertical Mergers and Innovation Markets*, at 6 (Apr. 1995) (citing *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989)). Thus, "innovation market analysis *does not require any radical departure* from the traditional tools used in antitrust analysis." *Id*. at 13 (emphasis added). True, there is little to no pricing data to consider. But the parameters are still clear. "In the innovation context, the product market consists of R&D [research and development] directed to particular new or improved goods or processes, and the close substitutes for that R&D." *Id*. at 15.

Petitioners' argument today—that "speculation about future substitutability cannot prove a relevant market" (Pet. Br. 30)—simply cannot be squared with counsel for Illumina's own prior interpretation of the Commission's statutory responsibilities. As Amicus AELP demonstrates below, and courts have nearly always accepted, Section 7 is necessarily and almost exclusively concerned with future market conditions and will always involve some degree of speculation. Thus, the relevant product market adopted by the Commission—the "research, development, and commercialization of MCED tests" (the "R&D Market")[2]—is wholly appropriate under both a plain reading of the statute and courts' interpretation of the phrase "any line of commerce." (Op. 24, 34; Conc. Op. 1.)

## ARGUMENT

## I.     THE CLAYTON ACT IS CONCERNED WITH FUTURE MARKET CONDITIONS

Section 7 was designed to stop the "rising tide of economic concentration." *Brown Shoe*, 370 U.S. at 317. It "[wa]s intended to permit intervention … when the effect of an acquisition *may be* a significant

---

[2] "MCED tests" are multicancer early detection tests that use a single blood sample to screen for multiple types of cancer. (IDF ¶21.)

reduction in the vigor of competition." H.R. Rep. No. 1191, 81st Cong., 1st Sess. 8 (1949) (emphasis added). The final language adopted by Congress is therefore quite broad:

> No person engaged in commerce or in any activity affecting commerce … shall acquire the whole or any part of the assets of another person engaged also in commerce *or in any activity affecting commerce*, where in any line of commerce or in any activity affecting commerce *in any section of the country*, the effect of such acquisition *may be substantially to lessen competition*, or to tend to create a monopoly.

15 U.S.C. § 18 (emphasis added). This "creates a relatively expansive definition of antitrust liability." *Cal. v. Am. Stores Co.*, 495 U.S. 271, 284 (1990). It provides "authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce *was still in its incipiency*." *Brown Shoe*, 370 U.S. at 317 (emphasis added).

The Supreme Court understood that "Congress used the words '*may be* substantially to lessen competition' … to indicate that its concern was with probabilities, not certainties." *Id*. at 323. "The section is violated whether or not actual restraints or monopolies, or the substantial lessening of competition, have occurred or are intended." *United States v. E.I. du Pont de Nemours & Co.* ("*E.I. du Pont*"), 353 U.S. 586, 589 (1957). "If the enforcement of § 7 turned on the existence of actual

anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967). It would, as Justice Gorsuch wrote in his textualist interpretation of Title VII of the Civil Rights Act, effectively rewrite the law and "deny the people the right to continue relying on [its] original meaning …." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020).

"No doubt, Congress could have taken a more parsimonious approach." *Id.* at 1739. Section 7 could have used the phrase "will [or shall] lessen competition or create monopolies." *Cf. id.* (regarding Title VII, Congress "could have added 'solely' to indicate that actions taken 'because of' the confluence of multiple factors do not violate the law. Or it could have written 'primarily because of' to indicate that the prohibited factor had to be the main cause of the defendant's challenged employment decision") (citations omitted). But Congress specifically aimed "to make it clear that [Section 7] is not intended to revert to the Sherman Act test." S. Rep. No. 1775, 81st Cong., 2d Sess. (1950). Instead, it "was intended to supplement the Sherman Act. Its aim was primarily to arrest apprehended consequences of inter corporate relationships *before those*

*relationships could work their evil.*" *E. I. du Pont*, 353 U.S. at 597 (emphasis added) (internal citation omitted), *quoted by Mercantile Texas Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 638 F.2d 1255, 1265 (5th Cir. 1981).

Courts have consistently held that Section 7's standards are forward-looking. "[T]he statute *requires a prediction*, and doubts are to be resolved against the transaction." *Elders Grain*, 868 F.2d at 906 (emphasis added). And contrary to Petitioners' position, it "does not command us to determine whether only present competition has been substantially lessened. In evaluating a merger under Section 7, the courts have looked at its effect *on future competition*." *Mercantile Texas*, 638 F.2d at 1265 (emphasis added); *see also United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362 (1963) (Section 7 "requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future"); *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1504 (D.C. Cir. 1986) ("an antitrust court must, of necessity, attempt to predict the future market and the merging firm's share of that market"). This applies not just in evaluating

how the merger might affect competition, but in determining what lines of commerce are affected in the first place.

## II.    THE R&D MARKET IS A PROPER LINE OF COMMERCE

Petitioners argue that the R&D Market adopted by the Commission and the ALJ is too broad and ask this Court to decide whether a relevant product market can "include speculative products that do not exist [or] may never exist and are not interchangeable." (Pet. Br. 2.) Their argument ignores a vast body of work by the courts and enforcers applying our antitrust laws to research and development markets, and it erroneously claims that products not approved by the Food and Drug Administration are too far removed from the marketplace to be considered.

Centrally, the phrase "any line of commerce" refers to the relevant market affected by the merger. *Philadelphia Nat'l Bank*, 374 U.S. at 356. It is facially broad, and the Supreme Court has instructed that "the boundaries of the relevant market must be drawn with sufficient breadth to include the competing products of each of the merging companies and to recognize competition where, in fact, competition exists." *Brown Shoe*, 370 U.S. at 326. Such competition can exist even among competitors, like

those identified by the Commission in its opinion and internally by Grail, who employ different methodologies to meet the same market demand, where "the trend in their respective technological evolutions is clearly in the direction of an eventual coalescence." *PPG Indus.*, 798 F.2d at 1502.

In the present case, the Commission (and the ALJ) properly identified a product market for the research and development of potentially lifesaving cancer screening products and a small group of firms already actively participating in that market. Petitioners' argument that it is too speculative, and that the research and development of MCEDs by Grail's competitors is not reasonably interchangeable with Grail's research, should be rejected.

## A.    The R&D Market for MCED Tests Already Exists

The concept of existing markets that Petitioners advocate for is vastly different from the one adopted by the courts. When courts refer to "existing lines of commerce," they are describing "the acquisition or merger of existing business enterprises" as opposed to "the formation of an entirely new entity which itself represented the creation of an entirely new market." *Fraser v. Major League Soccer, L.L.C.*, 97 F. Supp. 2d 130, 140 (D. Mass. 2000). In the latter scenario, where there are no existing

competitors, the creation of an entirely new entity and an entirely new product cannot reduce competition. *Id*. But this Court is faced with the former scenario, the acquisition of an existing enterprise within an established product market with a small number of known, existing competitors.

Grail was formed in 2015 with the purpose of researching and developing MCED tests. (IDF ¶¶20–21.) "At the time of Grail's formation, no other oncology testing company was developing liquid biopsy cancer screening tests." (*Id*. ¶30.) The formation of Grail and its initial endeavor to create MCED tests did create an entirely new line of business, just as the creation of Major League Soccer introduced a professional Division I soccer league to the United States and just as Xerox's acquisition of certain patents led to an entirely new market for plain paper copiers. *Fraser*, 97 F. Supp. 2d at 140; *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1211 (2d Cir. 1981).

However, the market today has changed considerably. Grail may have been the first entrant into the R&D Market, but it is no longer the only one. The FTC identified seven, all at different stages of research and development. (Op. 14–19.) Grail itself identified six firms actively

engaged in MCED test development that Grail viewed as its "top tier" competition. (IDF ¶¶324, 380, 422, 447, 509); *see also PPG Indus.*, 798 F.2d at 1505 (describing evidence that competitors were identified by merging parties in their own internal documents as "overwhelming"). And all of the cited MCED test developers, including Grail, perceive the technology that Illumina owns and licenses to MCED test developers as critical to their work and "the only technology available." (Op. 21; IDF ¶¶588, 591, 593, 598, 601–634.) The line of commerce very much exists, such that a vertical merger between Petitioners would unquestionably give Illumina the ability and incentive to use its control of next-generation sequencing technology to foreclose new entrants in the R&D Market. (Op. 43–45, 47–53; IDF ¶¶746–805.)

## B.   The Impact of Innovation on Competition is Widely Recognized

Having established that the R&D Market is an existing one, the question becomes who falls within it. Petitioners argue that the Commission "invent[ed] a legally erroneous R&D market" and that there is no "basis to define a relevant antitrust market based on the fact that firms are working toward a general objective (*e.g.*, developing a cancer screening test)." (Pet. Br. 37–38.) This is entirely out of line with how

Section 7 has been applied and interpreted to acquisitions implicating research and development efforts.

Our antitrust laws have always been concerned with the impact of anticompetitive behavior on innovation. Judge Learned Hand famously wrote:

> Many people believe that possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy; that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress; that the spur of constant stress is necessary to counteract an inevitable disposition to let well enough alone.

*United States v. Aluminum Co. of Am.*, 148 F.2d 416, 427 (2d Cir. 1945).[3]

In sum, a "threat to innovation is anticompetitive in its own right."

*United States v. Anthem, Inc.*, 855 F.3d 345, 361 (D.C. Cir. 2017).

---

[3] *See also Woods Expl. & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1303 (5th Cir. 1971) (antitrust laws exist "to establish an atmosphere which will stimulate innovations for better service at a lower cost"); *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022), *cert. denied sub nom.*, 143 S. Ct. 567 (2023) (plaintiff properly alleged that conduct "prevent[ing] innovative competitors from entering the market and growing large enough to meaningfully compete" was an anticompetitive effect); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015 ("[p]roduct innovation generally benefits consumers and inflicts harm on competitors"); *PPG Indus.*, 798 F.2d at 1504 ("Competition between them exists not only in bidding but … at the stage of research and development as transparency manufacturers try to influence airframe customers about

Again, this concept is not new. As written in 1995:

> Innovation resulting from vigorous research and development is often the precursor to entry in markets characterized by sophisticated and rapidly evolving technology. A merger or acquisition that adversely affects innovation, therefore, may reduce the probability of entry into and the intensity of competition in markets where the merging firms do not compete prior to the merger.

Richard J. Gilbert & Steven C. Sunshine, *Incorporating Dynamic Efficiency Concerns in Merger Analysis: The Use of Innovation Market*s, 63 ANTITRUST L.J. 569, 570 (1995). Recognizing these potential anticompetitive effects, federal agencies have routinely enforced the

---

types of transparencies for future generations of aircraft."); *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990) (citing *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 876–77 (Fed. Cir. 1985)) (antitrust laws are "aimed at encouraging innovation, industry and competition"); *DAT Sols., LLC v. Convoy, Inc.*, No. 22-cv-00088, 2023 WL 3058057, at *11 (D. Or. Apr. 24, 2023) (accepting allegation that "restraint harms competition by effectively eliminating 'would-be competitors' … by stifling innovation in the trucking industry"); *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1036 (C.D. Cal. 2007) (allegation that conduct "ha[d] a dangerous probability of 'stifl[ing] innovation' in the market" sufficient for antitrust injury); *United States v. Bos. Sci. Corp.*, 253 F. Supp. 2d 85, 89 (D. Mass. 2003) (pre-merger "[c]ompetition between the two was intense, and the competition *was a major catalyst for catheter innovation*") (emphasis added).

Clayton Act against mergers threatening harm to innovation.[4] The FTC

in particular has kept close tabs on the pharmaceutical and biomedical

industry, where innovation is a particularly important component of

---

[4] *See, e.g.*, U.S. Dep't of Justice, *Vertical Merger Guidelines* at 4 (2020) (a merged firm can use its control of access to a related to deter rivals from "innovation, entry, or expansion"); U.S. Dep't of Justice & Fed. Trade Comm'n, *Draft Merger Guidelines*, App'x 3 at 15 (2023) ("the Agencies may define relevant antitrust markets around the products that would result from that innovation, even if they do not yet exist"); *In the Matter of Amgen Inc., et al.*, 134 F.T.C. 333, 340 (2002) (consent decree resolving challenge to merger that would reduce "innovation competition" in the research and development of various treatments related to cancer and arthritis); *United States v. AlliedSignal Inc.*, No. 99-cv-2959, 2000 WL 33115901, at *17 (D.D.C. Mar. 22, 2000) (consent decree following merger challenge based in part on harm to innovation in the relevant markets); *In the Matter of Ciba-Geigy Ltd., et al.*, No. 961-0055, 1996 WL 743359, at *33 (F.T.C. Dec. 5, 1996) (consent degree recognizing that merger would affect competition in market for research and development of gene therapies despite no therapies having FDA approval); *In the Matter of Am. Home Prod. Corp.*, 119 F.T.C. 217, 220 (1995) (consent decree based in part on merger's effects on market for research and development of rotovirus vaccine, in which only three vaccine producers had "research projects either in clinical development or near clinical development"); *In the Matter of Adobe Sys. Inc., et al.*, 118 F.T.C. 940, 943 (1994) (consent decree recognizing that merger would "allow the merged firm to reduce innovation by delaying or reducing product development"); *In the Matter of Roche Holding Ltd., et al.*, 113 F.T.C. 1086, 1087 (1990) (consent decree defining the product market as "the research, development, production and marketing of: (1) vitamin C, (2) therapeutics for treatment of human growth hormone deficiency or other short stature deficiency …, and (3) CD4–based therapeutics for the treatment of AIDS and HIV infection").

firms' successes. The instant case—in which a handful of firms are competing but all require Illumina's technology—is no different.

Competition is a critical driver of innovation among existing entities in the R&D Market. Grail and its MCED developer rivals are variously engaged in the development of MCED tests using next-generation sequencing (NGS) technology, which share the goal of screening asymptomatic adults for cancer. (IDF ¶¶130–131.) But the various MCED developers also take different technical approaches, such as Exact/Thrive's analysis of "biomarkers", Freenome's "multiomic" approach, and Singlera's "methylation" analysis. (*Id*. ¶¶136, 275, 351, 491.) Yet each of these approaches to developing competing MCED tests rely on Illumina's NGS platform. Different methods will have different rates of success and are likely to face different challenges in the FDA approval process, heightening the need for a multitude of approaches that could bring tests to market more quickly. (*Id*. ¶186.) The different firms and different methods exist in what Judge Bork once dubbed a "high technology market." *PPG Indus.*, 798 F.2d at 1504.

As Judge Bork explained, the propriety of such a market is not called into question by the varying features of the different products. *Id*.

Instead, it is "buttressed" by the fact that none of them "alone will be able to meet the [] demands of the near future." *Id*. And competition between Grail and the other firms does not begin when they receive FDA approval. It exists in the current research and development stage when these firms are trying to influence what type of MCEDs will ultimately be accepted and adopted by the medical community. *Id*. Thus, they are clearly in "direct competition" in an active, existing R&D Market. *Id*.

## C.   Future Market Entrants Play An Important Role in Competition

Innovation markets are not the only place where the impact of future market entrants on competition is considered. Take, for example, the "actual potential competition" and "perceived potential competition" doctrines applied to Section 7 and long ago adopted by the Fifth Circuit. *Mercantile Texas*, 638 F.2d at 1264–65. The first recognizes that, "if a strong outsider is prevented from acquiring a dominant insider, the outsider will still enter the market independently, … [and] is more likely to become an aggressive price-cutting competitor." *Id*. at 1264. The second recognizes that an outsider firm can be so large and powerful, and the market sufficiently concentrated, that the outsider's "threatened entry … may intimidate already dominant firms into maintaining nearly

competitive prices to avoid enticing the outside[r] … into the market by the prospect of oligopoly profits." *Id.*

These actual and perceived potential competitor doctrines are, though less often utilized, recognized by a number of courts.[5] *E.g. United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531–32 (1973); *United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 660 (1964); *Mercantile Texas*, 638 F.2d at 1264; *Yamaha Motor Co. v. FTC*, 657 F.2d 971, 977–80 (8th Cir. 1981). As the Supreme Court explained, "The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition *which cannot be underestimated.*" *Falstaff Brewing*, 410 U.S. at 532 (emphasis added). "[P]otential competition … as a substitute for … (actual competition) may restrain producers from overcharging those to whom they sell or underpaying those from whom they buy." *United States*

---

[5] The Supreme Court twice declined to opine on the validity of the "actual potential competitor" doctrine, but it did acknowledge that there were "traces of this view" in a number of prior decisions. *Falstaff Brewing*, 410 U.S. at 537; *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 639 (1974).

*v. Penn-Olin Chem. Co.*, 378 U.S. 158, 174 (1964) (alterations in original). And as this Circuit explained, when a potential competitor opts to acquire a firm in lieu of entering the market independently, "the outsider's full competitive force will never be felt, [and] the merger is said to substantially lessen competition for purposes of the Clayton Act standard." *Mercantile Texas*, 638 F.2d at 1264.

Courts have also recognized, even in the context of the narrower Sherman Act,[6] the harm that anticompetitive conduct can bring to bear on nascent competitors that are not yet, but might one day become, market participants:

> [A] plaintiff who never entered a particular market but would have if not for an antitrust violation can *undoubtedly* challenge an antitrust violation in court. In fact, such firms may be prime targets for antitrust violations, because "early exclusion may be far cheaper than ruining or disciplining a recent entrant who has become established."

> To balance these concerns, we have held that "*one need not have an actual going business to establish a private antitrust injury*," but that a plaintiff must have had "(1) an intention to enter the business, and (2) a showing of preparedness to enter the business."

---

[6] Unlike Section 7, Section 2 of the Sherman Act requires actual monopoly power and willful possession or acquisition of that power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966).

*Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015) (citation omitted) (emphasis added). The D.C. Circuit similarly found in *United States v. Microsoft* that Microsoft's exclusionary conduct was actionable under Section 2 based on its effects on nascent competitors, despite the challenger firms not being present participants in the relevant market. 253 F.3d 34, 79 (D.C. Cir. 2001). The court found that "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts." *Id.*

In sum, a merger can be challenged under Section 7 based on the acquiring firm's potential *future* entry into the relevant market.[7] And restraints of trade and monopolies can be challenged under the Sherman Act based on a nascent competitor's potential *future* entry into the relevant market. Under this rubric, it would be doubly inimical to the

---

[7] The potential competitor doctrine is also used defensively to argue that a merger is not likely to lessen competition because low barriers to entry have left outsider firms well positioned to enter the relevant market. *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 174 (D.D.C. 2001).

purpose of the Clayton Act to exclude firms *actively engaged* in the research, development, and commercialization of MCED tests from the product market when the primary vice of the vertical merger is to foreclose their entry into the R&D Market in the first instance. *See Ford Motor Co. v. United States*, 405 U.S. 562, 570–71 (1972) ("The primary vice of a vertical merger … is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition ….") (quotations omitted). The product market adopted by the Commission and the ALJ is far less speculative than the potential and nascent competitor doctrines and is entirely consistent with how courts have assessed competition under our antitrust laws. Petitioners' argument to the contrary—that the challenger MCED tests already in development are not close enough to FDA approval to be considered part of the product market—must fail.[8]

---

[8] Petitioners point to *Mercantile Texas* for the proposition that other firms developing MCED tests cannot be part of the R&D Market because their FDA approval might be more than two years away. (Pet. Br. 44.) But *Mercantile Texas* created no such bright line rule. It merely instructed the Federal Reserve to "assess the volatility of [certain banking] markets to determine the fairness of predicting whether they w[ould] still be concentrated at the time when Mercantile [wa]s likely to enter." *Mercantile Texas*, 638 F.2d at 1272. And it was considering a

## III.  CONCLUSION

For the foregoing reasons, the order of the Commission should be affirmed.

Dated: August 2, 2023

Respectfully submitted,

*s/ Katherine Van Dyck*
Katherine Van Dyck
Lee A. Hepner
American Economic Liberties Project
2001 Pennsylvania Avenue NW
Suite 540
Washington, DC 20006
(202) 904-8101
kvandyck@economicliberties.us

*Counsel for Amicus Curiae*

---

defensive argument that the market was deconcentrating. *Id*. at 1267. In doing so, this Circuit stated that,

> [e]ven with a stronger trend towards deconcentration, years may pass before the influence of the dominant firms is substantially reduced. *The addition of more competition could still have the requisite beneficial effect.*

*Id*. (emphasis added). Thus, the evidence of potential entrants that was presented was insufficient to rebut the Board's evidence of concentration, and it was acknowledged that overcoming the effects of a dominant firm can take significant time. *Id*. Beyond confirming that future market conditions are relevant to Section 7 analysis, this has little bearing on whether a firm already actively involved in development of MCED tests should be included in the relevant R&D Market.

## CERTIFICATE OF COMPLIANCE

This brief complies with Local Rule 29.3 because it contains 4,501 words, excluding the parts that can be excluded. This brief also complies with Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced face using Microsoft Word in 14-point Century Schoolbook font.

Dated: August 2, 2023          *s/ Katherine Van Dyck*
                                Katherine Van Dyck

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 2, 2023          *s/ Katherine Van Dyck*
                                Katherine Van Dyck