JA2243

1                    UNITED STATES OF AMERICA

2                    FEDERAL TRADE COMMISSION

3              OFFICE OF ADMINISTRATIVE LAW JUDGES

4

5     In the Matter of:               )

6     ILLUMINA, INC.,                 )

7          a corporation,             )    Docket No.

8       and                          )    9104

9     GRAIL, INC.,                    )

10         a corporation,             )

11              Respondents.          )

12    -------------------------------)

13

14              Virtual Proceeding Via Zoom

15                 December 13, 2022

16                    1:00 p.m.

17                  Oral Argument

18

19        BEFORE THE HONORABLE COMMISSION:

20             LINA M. KHAN, CHAIR

21        CHRISTINE S. WILSON, COMMISSIONER

22     REBECCA KELLY SLAUGHTER, COMMISSIONER

23         ALVARO BEDOYA, COMMISSIONER

24

25     Reported by:  Sally Jo Quade, RPR, Court Reporter

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE FEDERAL TRADE COMMISSION:

 4          SUSAN A. MUSSER, ESQ.

 5          STEPHEN A. MOHR, ESQ.

 6          SARA WOHL, ESQ.

 7         JORDAN ANDREW, ESQ.

 8          Federal Trade Commission

 9          600 Pennsylvania Avenue, N.W.

10         Washington, D.C.  20580

11         (202) 326-2859

12         smusser@ftc.gov

13

14    ON BEHALF OF THE RESPONDENTS:

15          DAVID R. MARRIOTT, ESQ.

16          SHARONMOYEE GOSWAMI, ESQ.

17         Cravath, Swaine & Moore LLP

18         Worldwide Plaza

19         825 Eighth Avenue

20         New York, New York 10019-7475

21         (212) 474-1000

22         dmarriott@cravath.com

23

24

25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

JA2245

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

```
 1              P R O C E E D I N G S
 2                 -    -    -    -    -
 3        MS. TABOR:  Oyez, oyez, oyez.  All persons having
 4   business before the Federal Trade Commission are
 5   admonished to draw near and give their attention.  God
 6   save the United States and this Honorable Commission.
 7        CHAIR KHAN:  Good afternoon, everyone.  The
 8   Commission is meeting today in open session to hear oral
 9   argument in the matter of Illumina, Inc. and GRAIL,
10   Inc., Docket Number 9401, on complaint counsel's appeal
11   of the initial decision.
12        Counsel supporting the complaint is represented
13   by Ms. Susan Musser and the respondent is represented by
14   Mr. David Marriott and Ms. Shannon Goswami.
15        Each side will have 45 minutes to present their
16   arguments.  Counsel supporting the complaint will make
17   the first presentation and may reserve time for
18   rebuttal.  Counsel for the respondent will then make its
19   presentation.  Neither side has requested to set aside
20   time for discussing confidential information, but
21   nevertheless, the Commission voted to close portions of
22   this meeting as needed to discuss such information
23   pursuant to 5 USC 552(B), (C), (4) and (10).  If
24   necessary, each side is permitted to reserve up to 20
25   minutes of their total presentation time for discussion
```

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    of confidential information.  You should each ensure

2    that any discussion of confidential information occurs

3    at the end of your presentation.  When you are ready to

4    discuss confidential information, please let us know so

5    we can go into confidential session.  During that time,

6    the argument will not be webcast to the public and we

7    will resume the webcast once any confidential

8    information has ended.

9            Ms. Musser, would you like to reserve any time

10   for rebuttal?

11           MS. MUSSER:  Yes, Chair Khan, I would like to

12   reserve 15 minutes.

13           CHAIR KHAN:  Great.  We have noted that, and when

14   you are ready, you may begin.

15           MS. MUSSER:  Good afternoon, Commissioners.  This

16   is Susan Musser for complaint counsel.  I am joined

17   today at counsel table by Steve Mohr, Jordan Andrew and

18   Sara Wohl.  Devin Allen will be running the slides for

19   me today.

20           In 1950, Congress amended the Clayton Act to

21   explicitly extend the vertical mergers that deprive

22   rivals of a fair opportunity to compete.  Over the

23   ensuing 60 years, courts have developed two main ways to

24   assess whether an acquisition poses just such a risk.

25   The ability and incentive framework as applied by AT&T

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    and the Brown Shoe framework.  The market realities here

2    in this case show that this is not a close call under

3    either framework.  Specifically, the initial decision

4    recognizes four key facts that when taken together with

5    the rest of the record evidence and applied in the

6    proper legal framework are sufficient to meet complaint

7    counsel's initial burden.

8         Namely that first MCED, or multicancer early

9    detection tests, have no functional alternatives to

10   Illumina in order to run their test.  Second, that MCEDs

11   are completely dependent upon Illumina for every facet

12   of their business.  Simply put, these tests cannot be

13   run without Illumina's sequencers or consumables.

14        Third, that there is current and robust

15   innovation competition happening today between GRAIL and

16   its competitors.  And fourth, there are billions of

17   dollars of incentives at stake here.

18        Collectively, these facts show that this is no

19   ordinary vertical merger, and instead, this case

20   presents clear anticompetitive tendencies that are

21   precisely the type of harms Congress sought to arrest in

22   their incipiency by extending Section 7 of the Clayton

23   Act to vertical mergers.

24        First, let me highlight key facts -- yes,

25   Commissioner Wilson?

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1          COMMISSIONER WILSON:  Thank you, counsel.  The

2     ALJ did not address possible entry into the NGS market,

3     but you mentioned Illumina is the only choice.

4     Respondents' expert, Professor Willig, may he rest in

5     peace, identified several likely entrants into NGS

6     sequencing, and I don't believe these names are

7     confidential, Ultima Genomics, Singular Genomics, La

8     Roche, Omniome and Element Biosciences.

9          Can you tell me why we should not consider these

10    possible potential entrants as eroding Illumina's

11    monopoly position in NGS?

12         MS. MUSSER:  For these entrants to offset the

13    harm here, they must do so in a manner that is timely,

14    likely and sufficient.  And these potential upstream

15    entrants simply do not have -- fail for one of many of

16    those reasons.  I want to be careful here to not

17    disclose any in camera information, but if you look at

18    complaint counsel's findings of fact, you will see that

19    either entry is not likely for these tests, meaning that

20    there is no evidence in the record to show that they

21    will enter in time to constrain the harm that is going

22    to happen from this transaction.

23         Second, many of these tests lack key

24    commercialization and technical features that are

25    necessary for these MCED tests to run their test

Oral Argument

Illumina, Inc. and Grail, Inc.                                          12/13/2022

1    effectively.  If you look at the record evidence, these
2    MCEDs need something very specific.  These are highly
3    complicated tests that need to be run with precision,
4    meaning they need a high throughput, they need high
5    accuracy, and they need cost effectiveness, and finally,
6    they need dependability.  So these MCEDs need to know
7    not that there is a possibility that they may work some
8    day, but that they are sufficient to meet their
9    commercialization needs.  And there is no evidence in
10   the record that any single one of these is sufficient to
11   meet the needs of these MCED tests.
12          I also want to highlight the evidence from BGI.
13   As this Commission took judicial notice, the
14   reputational constraints and the privacy concerns of
15   that potential upstream entrant alone, are, again,
16   another reason and another way that this possible entry
17   cannot offset the harm here.
18          Taking a step back from that, I think it's also
19   important to understand the switching costs.  So even if
20   theoretically an upstream NGS entrant could enter in
21   two, five, ten years, which there is no evidence in the
22   record that such an entry could occur, it costs a lot of
23   money to switch these tests to be run on a particular
24   sequence.  We've heard in the record that these tests
25   are designed to work like a lock and a key and would

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    need to start over in order to be even passable with
2    these tests.
3         COMMISSIONER WILSON:  Counsel, Illumina presents
4    more sophisticated platforms, presumably there would be
5    switching costs as MCEDs move from one to the next
6    advanced platform even within Illumina, so what is the
7    incremental cost of switching away to a different NGS
8    provider, assuming that one were to come to market?
9         MS. MUSSER:  So there's evidence in the record
10   that switching from Illumina sequencer to Illumina
11   sequencer won't require nearly as much redevelopment,
12   which kind of makes sense.  If you're switching or
13   upgrading a MacBook or something that's going to require
14   a lot less technical adaptation than, say, switching
15   from a MacBook to a PC.
16        There's also evidence in the record that explains
17   that Illumina will have and has in the past offered
18   particular discounts or tools in order to offset any
19   costs of entry.  So the costs of entry -- of switching
20   between Illumina sequencers is not nearly as high as the
21   cost of switching to whole other sequencers, but
22   regardless of the comparative costs, the record evidence
23   shows or has failed to show that there are any possible
24   upstream entrants that are even likely to meet the
25   technical or commercial capabilities such that this

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    theoretical problem is even something the market has to

2    consider.

3         COMMISSIONER WILSON:  Thank you, counsel.

4         MS. MUSSER:  So first, let me highlight a few key

5    facts about how complaint counsel has met its initial

6    burden under the ability and incentive framework.

7    Taking ability first.  The unusual decision recognized

8    that the merged firm will have the ability to foreclose

9    post-merger as each and every MCED witness testified

10   during the administrative hearing.

11        For example, Mike Nolan, Freenome, one of GRAIL's

12   rivals, chief executive officer testified, "We just

13   don't have -- we don't see a suitable substitute to meet

14   our highest-level requirements."  Dr. Darya Chudova,

15   Guardant, another rival senior vice president of

16   technology also explained that "Illumina sequencers are

17   the only game in town."

18        Simply put, MCED tested offers have no functional

19   substitutes now or in the near future for the reasons I

20   just mentioned in response to Commissioner Wilson's

21   questions.

22        And MCEDs need Illumina sequencers.  Every single

23   one of GRAIL's rival MCED test developers explained that

24   they are completely dependent upon Illumina NGS

25   sequencers during research, development and

10

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    commercialization.  Bill Getty explained, it relies on
2    Illumina for technical support, for supplies, as well as
3    access to technology.
4         And it's helpful here to take a step back,
5    Commissioners.  MCEDs are a lab test.  They take blood
6    and perform a sophisticated DNA analysis on that blood.
7    To do that, they have to use the DNA sequencer.  That's
8    how these tests work.  They cannot be run without a
9    sequencer.  And Illumina and MCEDs are designed to run
10   on Illumina's sequencer in particular, like a key is
11   designed to work with a particular lock.
12        As such, no matter what Illumina does with regard
13   to pricing, supplies or support, GRAIL's rivals have
14   simply no functional alternatives.  And, if Illumina
15   were to disadvantage them, GRAIL's rivals must simply
16   take the punch and the consequences that come with it or
17   get out of the ring.
18        As Mr. Getty testified, without Illumina's NGS
19   sequencers, it is kneecapped in its ability to run its
20   lab, which would, of course, flow through to ability to
21   compete.
22        COMMISSIONER WILSON:  Counsel?
23        MS. MUSSER:  Yes?
24        COMMISSIONER WILSON:  So let me ask a couple of
25   questions.  We're talking about ability and incentive.

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    There is different descriptions of the legal requirement

2    for anticompetitive effects, from disclosure arising

3    from the record complaint counsel has focused on

4    increasing either ability or incentive or both, and

5    respondent claims there must be both ability and

6    incentive plus I think something else.

7         What are the three cases, the three strongest

8    cases that you would point me to to illustrate your

9    description of the legal standard?

10        MS. MUSSER:  I would point you to Brown Shoe.

11   Brown Shoe is a case from the Supreme Court that, of

12   course, we're all very familiar with.  It is routinely

13   cited in antitrust decisions.  That lays out one of the

14   frameworks that complaint counsel is relying on.

15        I would also point the Court to the PolyCore

16   case, which talks about the importance of the incipiency

17   standard and how the Clayton Act is designed to stop

18   these anticompetitive harms in their incipiency.  And

19   finally, I would point you to the analysis -- pardon me,

20   the analysis in AT&T, which applied the ability and

21   incentive framework that we have used throughout the

22   course of our briefing.

23        COMMISSIONER WILSON:  Thank you.  And when we are

24   talking about foreclosure in anticompetitive effects,

25   obviously the open offer looms large in the discussions

Oral Argument

Illumina, Inc. and Grail, Inc.                                12/13/2022

1    in the trial before the ALJ and in the briefings.

2    Counsel has argued -- complaint counsel has argued that

3    Illumina's current 100 percent market share of the NGS

4    market provides the merged firm with the ability to

5    foreclose the market.  Let's stipulate that the open

6    offer may not perfectly eliminate foreclosure.

7          To what extent does the open offer ameliorate the

8    ability of Illumina to foreclose downstream competitors

9    in some way?  Could you perhaps gauge that for me on a

10   scale of zero to 100?

11         MS. MUSSER:  I think it's helpful to look at what

12   the open offer needs to do under the case law, and under

13   the case law as this Court has analyzed in Otto Bock and

14   as the United States v. Aetna court analyzed, it needs

15   to offset the harm.  So respectfully, ameliorating the

16   harm or alleviating the harm isn't the relevant

17   standard; however, in this case, any ability given the

18   utter dependency cannot substantially -- cannot offset

19   the substantial -- the reasonable probability of

20   lessening competition.

21         If there is any way that the open offer here

22   cannot completely eliminate the ability in this case

23   given the utter dependency of MCEDs on Illumina's

24   sequencers and how any ability to delay, to stall, to

25   provide an inferior product, stems that relationship to

JA2255

13

Oral Argument

Illumina, Inc. and Grail, Inc.                    12/13/2022

1    its ability to compete, here what the evidence shows is
2    that even if it can offset some mechanisms for harm, it
3    cannot show that complaint counsel has not shown a
4    reasonable probability of substantially lessening
5    competition.
6        COMMISSIONER WILSON:  So complaint counsel has
7    argued there are extensive holes in the open offer.
8    What do you see as the largest holes?
9        MS. MUSSER:  I think the largest hole is the
10    flexibility.  There has been a lot of briefing and a lot
11    of back and forth in this case, Commissioner Wilson, and
12    I think that here what we have seen throughout that
13    briefing is that complaint counsel and respondents argue
14    about how the open offer should be interpreted, which
15    holistically proves the point that here there is
16    incredible disagreement on what these terms even mean,
17    which is going to lead to enforceability problems as
18    well as problems in how this is implemented in a way to
19    protect MCEDs.
20        I think a big hole is the pricing provision.
21    Here, while this sets a price floor, as Illumina has
22    admitted extensively in its briefing, it projects the
23    price of sequencers to be going down, down, down, and
24    there's no evidence that they wouldn't decrease further
25    absent a hard official price floor.

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1          Second, as Dr. Darya Chudova explained, there is

2    dispute in the record about whether or not the way that

3    the pricing provisions operate in the open offer is even

4    meaningful.  Whether or not it should be priced per read

5    versus priced per gigabyte.  So that's a concrete

6    example of one of many holes in the open offer.

7          COMMISSIONER WILSON:  Thank you, counsel.

8          CHAIR KHAN:  I appreciate your clarifying that in

9    your view having an open offer that is ameliorating the

10   harm would not be sufficient, we really need relief that

11   would fully offset or reverse the underlying harm.  One

12   of the key issues posed to us is who carries the burden,

13   and where this inquiry fits in within the burden

14   shifting framework.

15         Could you share, you know, one way that we have

16   traditionally looked at these types of proposals is in

17   the remedy stage, respondents here suggest that we

18   should instead consider it as part of the prima facia

19   case.  Can you share more as to whether you think that

20   intrinsically considering it as part of the prima facia

21   case opens the door to accepting relief that would

22   depart from the tradition of only accepting remedies

23   that are fully reversing or offsetting the harm as

24   opposed to accepting ones that would just ameliorate it?

25         MS. MUSSER:  In either circumstance, either under

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    as part of the respondents' prima facia case, or pardon,

2    complaint counsel's prima facia case or respondents's

3    rebuttal case, it needs to offset the harm.  However,

4    the better course of both policy and law that this

5    burden be shifted to respondents, I'm happy to explain

6    that further, Commissioner Khan, if you would like.

7         CHAIR KHAN:  That's sufficient.  Thank you.  One

8    more question.  I appreciated you at the beginning

9    noting that there are two kind of primary governing

10   frameworks here, we have Brown Shoe and we have

11   incentive and ability.  Could you share more as to how

12   you see those interrelate or intersect.  Some have

13   suggested that some of the Brown Shoe factors are, in

14   fact, a proxy for incentive and ability, some suggest

15   these are entirely separate inquiries.  It would be

16   helpful to hear how you see these two frameworks

17   intersect or not.

18        MS. MUSSER:  These are two separate frameworks.

19   Either one leads to the same result in this case that

20   complaint counsel has met its prima facia showing of a

21   substantially lessening of competition.

22        That being said, there is overlap to the extent

23   that ability and incentive are assessed in the Brown

24   Shoe framework.  So if you look at the Brown Shoe

25   factors, they look at the ability to foreclose.  That

16

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    ability to foreclose a share of the market is another
2    way of looking at ability under the ability and
3    incentive framework.  Likewise, one of the factors is
4    the nature and purpose of the transaction.  Encompassed
5    within that factor is also incentive.
6          So the ability and incentive framework is
7    analyzed in Brown Shoe, where Brown Shoe deviates a bit
8    is there are other factors that can also form part of
9    the analysis.
10         CHAIR KHAN:  Okay.  Thank you.
11         MS. MUSSER:  Touching a little bit on incentive,
12   I want to highlight a few key reasons that in contrast
13   to Judge Chappell's initial decision, that complaint
14   counsel has met its burden to show an incentive to
15   disadvantage GRAIL's rivals.  The first is that Illumina
16   is betting the future of its company on this
17   transaction, in that Illumina says that this transaction
18   serves two key functions, to transform them from a
19   clinical tool company to a clinical testing company, as
20   well as to provide a mechanism for participation in a
21   multi-billion dollar market.
22         On your screen is a statement from Francis
23   deSouza, Illumina's CEO, to investors, explaining that
24   this transaction will provide them access to this market
25   opportunity.  Taking these two together, Illumina views

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    the future of its company not geared towards winning in

2    the NGS market, but rather in tapping the opportunity of

3    clinical testing markets like the MCED market.

4         Second, GRAIL isn't the only one racing towards

5    this pot of money.  Other companies are also developing

6    tests which share key features with Galleri and are, in

7    fact, designed to compete with it and are competing with

8    it today.  There are two parts of the record that

9    support this.  The first is evidence that shows that

10   these companies are all blood-based tests that look for

11   and identify the location of cancer asymptomatic

12   patients.

13        Evidence also shows that these all have the

14   technical capability for a similar number of cancers as

15   GRAIL and are being developed to compete with GRAIL at

16   commercialization on the number of cancers detected, on

17   the location of those cancers, their sensitivity and

18   specificity.

19        Indeed, evidence in this case shows that Exact,

20   Freenome, Guardant, Singular, Helios, GRAIL, and others,

21   are both current innovation competitors and future

22   commercial competitors.

23        COMMISSIONER WILSON:  Counsel?

24        MS. MUSSER:  I want to take a moment -- yes,

25   Commissioner Wilson?

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1          COMMISSIONER WILSON:  So respondents' expert

2     Dennis Carlton claimed a procompetitive benefit of the

3     transaction is that GRAIL will be brought to market

4     sooner and as a consequence lives will be saved in

5     discussing the MCED rivals to GRAIL.  Have you sought to

6     assess the cost of foreclosure in terms of lives just to

7     have equivalence with the respondents' expert?

8          In other words, have we gauged the foreclosure

9     impact in terms of the delay that it will cause to the

10    other MCED tests and therefore the cost in lives brought

11    about by the delay of bringing those other tests to

12    market?

13         MS. MUSSER:  What GRAIL's MCED competitors have

14    explained, and as detailed in Fiona's report, that

15    delaying these competitors' ability to get to market

16    soon will have a meaningful impact on the ability of

17    this market to save lives.  So that is an inherent part

18    of the assessment, and one of the harms that could flow

19    from this competition.  So that is something that's been

20    assessed.

21         COMMISSIONER SLAUGHTER:  Counsel, can I just ask,

22    I thought Commissioner Wilson asked a very, very good

23    question, do I understand your answer to be that there

24    is a meaningful impact, but it hasn't been or maybe

25    couldn't be quantified?

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1          MS. MUSSER:  Yes.  I think that's right, that

2    while this has certainly been assessed as part of the

3    market characterizations of this test, it hasn't been

4    given a precise number as your question indicates.

5          COMMISSIONER SLAUGHTER:  I think it's an

6    important point because part of respondents' advocacy

7    for this deal, not only in the papers in front of the

8    Commission today, but in the press, in an extensive

9    lobbying campaign, has been the only if you care about

10   saving lives, you must let this deal go through.  And I

11   think it's important, Commissioner Wilson pointed to an

12   important other side of the argument, which is perhaps

13   one way to think about lives saved is one test to

14   market, but a different way to think about it might be

15   myriad tests to market and robust competition in

16   innovating multiple tests.

17         So I'm wondering if you could expand a little bit

18   on the harm on the side of competition or saving lives

19   in the absence -- or were the transaction to go through.

20         MS. MUSSER:  Absolutely, Commissioner Slaughter.

21   So as I was -- I think it's helpful to look at what the

22   competition is that is occurring right now, and what the

23   impact of this foreclosure will be on this current

24   competition.  What we see in the record evidence is we

25   see that both GRAIL and its rivals are looking at what

20

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    these other companies are doing, improving their tests

2    and developing a better product as a result of that.

3    That is in the record evidence.

4            If you look at pages 17 through 19 of our reply

5    brief, we detail all of the evidentiary findings.  So

6    not only is -- that is a direct impact, which is there

7    is going to be not only -- the tests that do get to

8    market are not going to be as good because the path as a

9    whole will be moving slower as a result of this test.

10           Moreover, to the extent that some of these

11   competitors cannot make it to market and will never

12   commercialize, that also will have an impact on lives

13   saved.  Put simply, it's helpful to think of this as an

14   innovation race, and together with competition, this

15   race moves quicker and gets to the market sooner and

16   with better choices for consumers.  And that results

17   both in an impact to lives saved.

18           It's really helpful to think about this perhaps

19   in the context of Covid.  Having multiple choices of

20   convenience and multiple competitive options was a

21   benefit to patients overall.  If you think about it, for

22   some of us, J&J was a good alternative, while Moderna

23   was a good alternative for others, depending on our

24   needs.  Likewise, having multiple choices and multiple

25   MCEDs that reach the market will not only make the tests

Oral Argument

Illumina, Inc. and Grail, Inc.                    12/13/2022

1    that do reach the market collectively better, but will

2    provide life-saving alternatives to patients.

3           In assessing innovation incentives, it's helpful

4    to also think about what is the cost of foreclosing.

5    And here the evidence in this case shows that Illumina

6    stands to benefit from any trip, stumble or fall from

7    GRAIL's rivals.  First, to the extent that GRAIL's

8    rivals fall out of the race, a reduction in innovation

9    competition puts less pressure and less cost on GRAIL

10   itself to innovate and commercialize.

11          Second, to the extent that commercialization is

12   delayed, stalled or made more difficult, GRAIL's rivals

13   will benefit by entrenching its market share and beating

14   its rivals to full commercialization.  Those are the

15   benefits that GRAIL stands to receive by foreclosing its

16   competition.  Those will not be offset by any costs.

17          In the first instance, the record evidence shows

18   that Illumina doesn't have to stop supplying GRAIL

19   totally in order to disadvantage its rivals.  Instead,

20   Illumina can simply hamper other MCEDs ability to

21   develop and commercialize without losing 100 percent of

22   its sales.

23          But taking a step back, even if it were to lose

24   100 percent of its NGS sales to GRAIL's rivals, that's

25   only 2 percent of its sales, a very, very small fraction

22

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    of its business.

2            And, finally, and perhaps most persuasively, and

3    as the initial decision recognized, on a test-by-test

4    basis, Illumina projects earning more from the sale of a

5    Galleri test than a sale of a consumable and sequencer

6    to Galleri's rivals, meaning that Illumina stands to

7    make much more profit from the sale of Galleri than a

8    sale to Galleri's rivals.

9            As such, any lost NGS sales are more than

10   compensated by winnings in the MCED market.  As the

11   evidence stands, Illumina has much to gain and very

12   little to lose by disadvantaging GRAIL's rivals and

13   giving it an incentive to punch first through whatever

14   means necessary.

15           An analysis of the Brown Shoe framework provide

16   another route of reasonable probability of substantially

17   lessening competition.  In the first instance, the

18   Supreme Court made clear that if the shares to market

19   foreclosed is so large that it approaches monopoly

20   proportions, the Clayton Act will, of course, have been

21   violated.  Here, Illumina is a sole provider of NGS

22   sequencers, a critical input for the research,

23   development and commercialization of MCED tests.  As

24   such, Illumina has the power to foreclose monopoly

25   portions of the MCED market.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Oral Argument

Illumina, Inc. and Grail, Inc.                                      12/13/2022

1        The initial decision failed to properly consider

2   Illumina's ability to foreclose when assessing complaint

3   counsel's cause under Brown Shoe, but complaint counsel

4   does not just rely on foreclosure alone, but has also

5   shown additional Brown Shoe factors to support a finding

6   that the merger has a reasonable probability of

7   substantially lessening competition.

8        Now, despite complaint counsel's robust showing

9   under both AT&T and Brown Shoe, respondents argue that

10  complaint counsel has failed to meet its prima facia

11  case.  While the initial decision's conclusions are

12  flawed for many reasons, as laid out fully in our

13  briefing, I want to highlight three key arguments

14  relating to Illumina's incentives to foreclose.

15       First, the initial decision argues that Galleri

16  is too differentiated from its rivals to be a diversion.

17  This finding is in error.  MCED witnesses, those who are

18  best positioned to testify as to their test

19  capabilities, explained that Galleri and its rivals

20  share key features and are developing a test to compete

21  on the very features that respondents argue are

22  different.  GRAIL's own documents support this robust

23  finding of current competition and projected future

24  commercial competition.

25       Second, respondents argue that because MCED tests

24

Oral Argument

Illumina, Inc. and Grail, Inc.                              12/13/2022

1    aren't yet for sale, Illumina cannot and does not have a
2    current incentive to foreclose.  This argument, however,
3    ignores robust current innovation competition and
4    creates a safe harbor unrecognized by statute or case
5    law exempting developing markets from the reach of the
6    Clayton Act in violation of the incipiency standard laid
7    out in PolyCore.
8         This argument also falsely assumes that
9    respondents must know the precise details of GRAIL's
10   rivals at commercialization in order to have an
11   incentive to foreclose.  Not true.  Rather, there must
12   only be a sufficient risk of diversion to give rise to
13   foreclosed GRAIL's rivals, and here, GRAIL's ordinary
14   course documents have already identified companies that
15   pose just such a risk to diversion.
16        This argument also ignores evidence of a key
17   GRAIL rival, Exact.  GRAIL has identified Exact as its
18   most significant competitor in MCED space.  And the
19   record evidence shows that Exact and GRAIL share key
20   features and are on similar development timelines.
21        Third, the initial decision ignores the change in
22   incentives from shifting from a 12 percent owner of
23   GRAIL to 100 percent owner of GRAIL.  But this argument
24   is both legally and factually flawed.  The Clayton Act
25   is concerned with a lessening of competition, and as the

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    Court explained in United States v. General Dynamics,

2    the proper focus should be on the change resulting from

3    the merger.

4         Commissioners, I find that my time is up.  I'm

5    happy to answer any additional questions if you have

6    any, or reserve the rest of my time.

7         CHAIR KHAN:  I just have one question.  As you

8    noted, the initial decision was quite skeptical as the

9    harm.  What do you see as your strongest evidence of the

10   harm and that it would be probable and imminent?

11        MS. MUSSER:  The robust evidence of the current

12   competition happening today.  There is a slide in the

13   deck that we provided to the Commission in advance that

14   shows that document after document after document of

15   ordinary course testimony supported by those same MCED

16   companies' testimony in this proceeding that explains

17   that they are competing, that that competition matters,

18   and that competition is threatened.

19        CHAIR KHAN:  Okay.  Thank you, Ms. Musser.

20        We will now go to Mr. Marriott and Ms. Goswami.

21   When you are ready, you can begin.

22        MR. MARRIOTT:  Thank you, Madam Chair,

23   Commissioners, we appreciate the opportunity to be heard

24   this afternoon.

25        There are five reasons or sets of reasons,

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    really, why we respectfully submit that the complaint

2    counsel's challenge to this transaction fails.  Chief

3    Judge Chappell expressly adopted two of the five,

4    adopted another in part and found it unnecessary to

5    reach the remaining two.  And we would like to focus our

6    remarks this afternoon, if we may, on the grounds

7    expressly adopted by Chief Judge Chappell.

8         With your permission, I will begin with the first

9    ground for affirmance, focusing on what we believe are

10   five flaws in complaint counsel's claim that fully

11   reuniting Illumina and GRAIL will harm competition.  If

12   time allows, I will touch briefly upon alternative

13   grounds for affirmance, including efficiencies, but not

14   the open offer.  Ms. Goswami will address the open offer

15   in our remaining ten or 15 minutes.

16        So before we do that, let me say just a few

17   words, if I may, about who Illumina is and why it seeks

18   to reunite with GRAIL and what from our perspective is

19   at stake in this transaction.

20        Illumina is a leader in NGS sequencing, to be

21   sure.  It has not only introduced a series of unmatched

22   innovations, but also it has brought the cost of

23   sequencing the full human genome from $10 million in

24   2007 to less than $700 today.

25        COMMISSIONER WILSON:  Counsel, if I may?

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1          MR. MARRIOTT:  Yes, Commissioner?

2          COMMISSIONER WILSON:  So your expert, Professor

3   Carlton, claims that a procompetitive benefit of the

4   transaction is that GRAIL will be brought to market

5   sooner and as a consequence lives will be saved.  He

6   accepted an estimate of one year sooner from Illumina's

7   executives.  And I'm wondering, can you tell me the best

8   evidence that supports this one-year acceleration for

9   bringing the test to market and obtaining FDA approval?

10         MR. MARRIOTT:  It's a great question,

11  Commissioner Wilson, and I think there is, frankly,

12  considerable evidence to that end.  And what I would say

13  to the Commission is this:  I think everybody in this

14  case agrees that cancer screening can save lives.  And

15  you can find that at respondents' findings of fact 1117

16  through 19.

17         Everybody likewise agrees that accelerating the

18  adoption of an MCED test will save even more lives, and

19  you can find that at respondents' findings of fact 1122.

20  The only question, we think, is whether further

21  reuniting Illumina and GRAIL will further accelerate the

22  adoption of this test.  And we think the evidence

23  showed, respectfully, that how could it have any other

24  effect?

25         Illumina is the world's foremost leader in NGS

Oral Argument

Illumina, Inc. and Grail, Inc.                          12/13/2022

1   sequencing technology, it has deep relationships and

2   credibility with regulators and with payers, and you'll

3   find that at respondents' findings of fact 1131.5 and

4   1131.7.

5         Illumina is a sophisticated global operator of

6   NGS testing at scale.  It founded GRAIL.  Its brand is

7   synonymous with innovation and low-cost sequencing.  And

8   its innovations in NGS sequencing have allowed for the

9   development of entire industries.

10        That's kind of it at a high level, Commissioner,

11  but on top of that, we offered at trial, as you know,

12  collectively, evidence from some 50 plus fact witnesses

13  and experts.  Unlike complaint counsel, we had medical

14  experts who testified with respect to what this test can

15  do and what it will mean to accelerate the test and the

16  effect that it will have upon lives and the prospect of

17  being able to save lives.

18        Dr. Cody addressed that, for example.  Dr. Abrams

19  addressed that.  And a number of fact witnesses, who

20  albeit employees of Illumina and GRAIL, are nonetheless

21  themselves experts, including M.D.s in the field who all

22  expressed that opinion.  And I would say --

23        COMMISSIONER WILSON:  So, Professor Carlton

24  described in his expert report testimony from Thrive,

25  Guardant and Karius that downstream rivals do not need

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    information and support from Illumina to obtain FDA

2    approval and presumably that was offered as evidence

3    that no foreclosure is likely.  And so I'm wondering

4    what kinds of information and support from Illumina do

5    third parties need and what kinds of benefits could they

6    get from Illumina but for Illumina's acquisition of

7    GRAIL.

8          In other words, it seems to me to be a double

9    standard to say the MCED, the other MCED developers

10    don't need anything from Illumina, but, in fact, GRAIL

11    will be able to bring its product to market and obtain

12    FDA approval sooner if it is merged with Illumina.

13          MR. MARRIOTT:  Thank you, Commissioner.  I don't

14    think it's a double standard.  I think Dr. Carlton was

15    talking in the testimony to which you refer really about

16    two different things.  There's getting to market with an

17    LDT, a laboratory developed test, which is what GRAIL is

18    to market with, and then there's getting FDA approval

19    ultimately for a test of perhaps a different kind.  And

20    I think Dr. Carlton was reviewing -- was speaking to the

21    different types of assistance that may be required for

22    those different types of tests.

23          Illumina has, to be sure, contracts of different

24    varieties and kinds with different customers, pursuant

25    to which it provides different levels of service.  And

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    you get that service whether you're an MCED test

2    developer, whether you're not an MCED test developer,

3    and so that kind of service is provided, but it is not

4    in any way necessary for other than simply providing --

5    selling the instruments and selling the consumables for

6    Illumina to work closely with any of its customers for

7    them to be able to develop a downstream test.

8           And I think what, in fact, we've seen on this

9    very record is that the companies who are purportedly in

10   the process of developing rival tests for GRAIL are

11   companies that are developing those tests without any

12   meaningful input from Illumina as to what it is

13   precisely they're doing.  And I think several of the

14   developer witnesses themselves expressly testified to

15   that effect on their cross examination and I think some

16   of our experts, including Dr. Cody, for example, also

17   spoke to the same issue.

18          So I hope that, Commissioner, answers your

19   question.

20          COMMISSIONER WILSON:  Thank you.

21          CHAIR KHAN:  Just one followup on this on the

22   regulatory acceleration point.  So one of the pieces of

23   evidence that you all point to is Illumina's three

24   premarket approvals, but I understand that two of those

25   premarket approvals are for lab equipment, which is

Oral Argument

Illumina, Inc. and Grail, Inc.                    12/13/2022

1    already Illumina's core competency and don't relate to
2    the MCED test.  So help me understand how it is that
3    this transaction would actually help in that regard.  It
4    would seem that other partners would be better fits if
5    the goal was really to be able to help in that -- on
6    that dimension.
7         MR. MARRIOTT:  Thank you, Madam Chair.  Let me
8    say the following:  There are a number of different
9    capabilities that come into play in trying to accelerate
10   the development of the Galleri test in a way that gets
11   it widely available so as many people as possible can be
12   screened.  It includes experience with private payers.
13   It includes health system partnerships.  It includes
14   derisking the reimbursement challenges.  It includes
15   value assessment of various methods of development.  It
16   includes regulatory experience with PMAs.  You mentioned
17   that.  Global presence and expertise.
18        And Illumina has in each of those categories what
19   GRAIL simply does not.  And, frankly, it has in each of
20   those categories what nobody else on the planet actually
21   has.  As the leader in NGS sequencing, it has developed
22   a set of skills and expertise to put it in a unique
23   position in order to assist Galleri in this regard.
24        We are not saying Illumina has a perfect track
25   record in its own regulatory approval process, it does

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    not.  I don't think anybody does.  But what it has
2    learned through that process is what is necessary and
3    effective in getting a test through this process to get
4    it ultimately approved by the greatest number of people
5    possible.
6            And witness after witness, including an expert in
7    this field, Ms. Deverka, Dr. Deverka spoke to this very
8    issue with effectively unrefuted, unrebutted testimony
9    and cross examination largely didn't touch the relevant
10   issue about whether Illumina had the ability here to do
11   for GRAIL what no other company could do for GRAIL.  And
12   we respectfully submit it isn't terribly surprising at
13   the end of the day, Illumina founded GRAIL, after all,
14   and Illumina has always owned at least 12 percent on an
15   undiluted basis of the shares, the outstanding shares of
16   GRAIL.
17           COMMISSIONER BEDOYA:  Please go ahead,
18   Commissioner.
19           COMMISSIONER WILSON:  Just one quick followup,
20   Commission Bedoya.  Counsel, is this the kind of
21   expertise that can be hired?  In other words, can GRAIL
22   go out and find regulatory expertise that it could bring
23   in-house to smooth the FDA approval path?
24           MR. MARRIOTT:  So, Commissioner Wilson, complaint
25   counsel has argued that it is.  Respectfully, we submit

Oral Argument

Illumina, Inc. and Grail, Inc.                    12/13/2022

```
 1   it is not.  There is no question that one could go hire
 2   a consultant in one field or another, right?  We're not
 3   suggesting that there aren't people out there in the
 4   world who don't provide some regulatory assistance that
 5   can be hired out.  But what's necessary here in order to
 6   accelerate the development of this test, the test never
 7   before developed in the history so far as we know of
 8   human kind, and get it out to the greatest number of
 9   people, is not just a consultant here and there, it's
10   somebody who was able to touch upon all of the points
11   where expertise and assistance are required, along all
12   of the regulatory dimensions.
13           And if you look, Commissioners, for example, I
14   won't bother to bring it up, but at slides 44 and 45 of
15   the demonstratives that we present, you'll see those
16   different dimensions and what Illumina has there to
17   offer.  There is not a single witness, Commissioner
18   Wilson, who said during the course of this lengthy trial
19   that you could simply go get a consultant to do the kind
20   of thing that will happen here if Illumina and GRAIL are
21   allowed to reunite.  It's never been done.  No witness
22   said it could ever been done.  No fact witness.  And no
23   expert said it could ever be done.
24           So respectfully, while you can get consulting
25   expertise and input here and there, the collection of
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Oral Argument

Illumina, Inc. and Grail, Inc.                           12/13/2022

1    things that this transaction will put Illumina and GRAIL

2    in a position to do is something that we believe can

3    only be done by fully reuniting Illumina and GRAIL.

4           COMMISSIONER BEDOYA:  Counsel, I have a

5    background fact question that would be helpful for you

6    to opine on.

7           MR. MARRIOTT:  Sure.

8           COMMISSIONER BEDOYA:  To what does Illumina

9    attribute its success as a testing platform vis-a-vis

10   the company's -- other companies?  Is it the machine

11   learning algorithm?  Is it something else?  So that's

12   the first background question.

13          And then secondly, is that -- whatever that is,

14   is that protected by patent, and if so, for how long?

15          MR. MARRIOTT:  So I mean, there are a lot of

16   things I think, Commission Bedoya, that go into

17   Illumina's success as an NGS provider.  The algorithms I

18   think to which you refer are principally an issue with

19   respect to the GRAIL test kind of in the downstream.

20   But for Illumina, the sequencing steps, you know, they

21   involve kind of three principal dimensions.  They

22   involve library preparation, where you're taking the

23   strand of DNA and you're preparing it, you're tagging it

24   and you're preparing it to be analyzed.  They involve

25   the sequencing itself, right, which occurs on something

Oral Argument

Illumina, Inc. and Grail, Inc.                    12/13/2022

1    that this will diminish it, but it looks a little bit

2    like a copy machine, but it's far more complicated than

3    a copy machine.  And then there's the data analysis that

4    goes into that.

5          Illumina has developed expertise along each of

6    those three dimensions.  Some of that technology is, in

7    fact, covered by patents, and I don't think there's any

8    question about that, but we don't believe those patents

9    are an impediment to significant upstream competition

10   from other providers of NGS technology.  And, in fact,

11   the key patents expired in August of 2022.

12         So there are patents in the picture, but those

13   patents certainly, Commissioner, are not impeding

14   companies from developing rival NGS platforms to be used

15   in both end test development and in other diagnostics.

16         COMMISSIONER BEDOYA:  And do any patents remain,

17   other patents you've referenced in answering my

18   question, do any of them remain valid past 2034, or no?

19         MR. MARRIOTT:  Well, I'm afraid I don't know,

20   Commissioner, that the record addresses that, except I

21   don't believe -- let me put it this way, I don't believe

22   there's anything in this record that suggests that

23   Illumina has a patent that is valid beyond 2030 that

24   would preclude entry into this market by a rival -- by a

25   rival developer of NGS technology.

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1          COMMISSIONER BEDOYA:  Thank you.  And thank you

2      for the clarification on the algorithm.  You're right.

3      Thank you.  That's it.

4          MR. MARRIOTT:  You're very welcome.

5          If I may, what I would say is this:  There are,

6      in our view, five principal reasons why Chief Judge

7      Chappell was correct in his conclusion that this case

8      should be dismissed.  As I said, he only addressed two

9      in particular.  I want to focus attention, if I may, on

10     five reasons why we think he got it exactly right when

11     he said that this is not a transaction which will

12     substantially lessen competition, and then as I said,

13     I'll touch on some other alternative grounds if time

14     allows, and Ms. Goswami will talk about the open offer.

15         With respect to substantially lessening

16     competition, the overwhelming evidence, we believe,

17     supports the conclusion that foreclosing GRAIL's rivals

18     as alleged here would be inconsistent with Illumina's

19     past behavior, it would harm Illumina's primary present

20     and expected future business, and it would not benefit

21     Illumina certainly in the way that has been alleged by

22     complaint counsel.

23         Prior to closing this transaction, Illumina owned

24     12 percent of GRAIL and it was entitled to 7 percent of

25     its sales in perpetuity.  And under that structure,

Oral Argument

Illumina, Inc. and Grail, Inc.                              12/13/2022

1    Commissioners, Illumina made five times more from GRAIL

2    than it would have made from any other test maker.  And

3    yet, there is no evidence in this record of any actual

4    foreclosure by Illumina during the entire period of time

5    when Illumina was a 12 percent owner of GRAIL.

6            And to be sure, there is a difference between 12

7    percent and 100 percent, but nonetheless, 12 percent

8    difference, and under a structure in which Illumina

9    would make five times as much from the sale of any other

10   test, and yet not any evidence, none, of any foreclosure

11   by Illumina either as to actual products or as to R&D

12   development I think is a telling fact.

13           Foreclosing GRAIL's rivals here would harm

14   Illumina's primary business.  It would do that by

15   reducing NGS sales.  It would do it by causing

16   reputational damage.  It would do it by discouraging NGS

17   applications on Illumina's systems.  And, of course, it

18   would violate the open offer which, again, Ms. Goswami

19   will talk about.

20           COMMISSIONER SLAUGHTER:  Counsel, can I interrupt

21   and ask, you started your argument by saying GRAIL's

22   test is really the only one that can come to market.

23   Illumina's acquisition will accelerate its path to

24   market and we should see that benefit as very material

25   and very important.

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1        I'm having trouble reconciling that argument with

2    the one that you're making right now, which is that

3    Illumina has the incentive to consider -- to supply

4    other MCED manufacturers and help them develop products

5    and bring them to market.

6        Doesn't that tell us that there are other

7    products that could be coming to market, too, such that

8    we should not only see GRAIL as the viable MCED product

9    that could be available?

10        MR. MARRIOTT:  Commissioner Slaughter, we see it

11    I think a little bit differently.  To us, foreclosing

12    GRAIL rivals today, if there were rivals today, would

13    simply reduce NGS sales to Illumina.  It would be

14    Illumina shooting itself in the foot, it would be

15    Illumina hurting its current customers, and it would

16    discourage development on the NGS platform that is

17    really the mainstay of Illumina's business.

18        Illumina has some 6,600 customers of which the

19    purported rivals of GRAIL are but a relatively small

20    number.  And any acts of foreclosure here would not only

21    preclude -- would not only cause Illumina to lose those

22    NGS sales, but it would cause Illumina to lose sales by

23    those customers of non-NGS applications on the platform

24    and would damage the company's reputation, and I think

25    as a result disincent, as some of the experts found,

Oral Argument

Illumina, Inc. and Grail, Inc.                                                12/13/2022

1    development on the platform of which Illumina derives

2    the principal part of its revenues and profits.

3         The evidence here, the undisputed evidence here,

4    shows that Illumina will not recoup losses from GRAIL

5    before '23.  It won't even turn a profit with respect to

6    GRAIL until 2026.  And so there just isn't the near-term

7    or even a reasonably distant term incentive to

8    disadvantage and damage its own customers.

9         What's more, foreclosure here would not, contrary

10   to what has been alleged, divert sales to Galleri from

11   other putative rivals of Galleri.  And that's because,

12   among other things, Galleri is the only MCED test on the

13   market.  There are no current alternatives.

14        And contrary to what has been suggested by

15   complaint counsel, Galleri really is very different, so

16   far as we can tell, from anything that is in

17   development.  And whether or not there is an alternative

18   that will emerge is unknown and exactly what it will

19   look like when it emerges is unknown.

20        What we do know is that insofar as we can tell

21   anything about these tests, they are very different from

22   and not at all likely to be, as Chief Judge Chappell

23   expressly found, to be interchangeable with or

24   reasonably substitutable for the Galleri test.

25        COMMISSIONER SLAUGHTER:  Can I just ask, why

40

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    can't -- I'm sorry, Madam Chair.

2         CHAIR KHAN:  Go ahead, Commissioner Slaughter.

3         COMMISSIONER SLAUGHTER:  Why can't Illumina have

4    it all?  Why can't Illumina slow down deployment,

5    development or something short of full disclosure to

6    GRAIL rivals and still reap the benefit of those sales

7    while also preserving a monopoly position for GRAIL in

8    the market?  Like why wouldn't that be Illumina's

9    incentive?

10        MR. MARRIOTT:  Well, I think, Commissioner, I

11   think we can have it all, but not in the sense of which

12   you mean it.  I think we can have it all in the sense

13   that we can build and develop, build out the NGS

14   platform still, so that we incent development of

15   diagnostic tests of all kinds on that platform.  I think

16   we can achieve all of the objectives of this

17   transaction, including accelerating -- including a bunch

18   of R&D efficiencies and accelerating the market adoption

19   of the test and therefore saving lives.

20        We think we can do all of that without having to

21   damage or harm our customers.  We just don't believe the

22   incentive lies there.  And that, frankly, and I don't

23   mean to jump ahead and get to Ms. Goswami's piece, but

24   that's why doing the open offer was so easy because it

25   reflects exactly what Illumina intends to do anyway.  We

41

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    don't think we benefit by foreclosing rivals in this
2    space.  What we benefit from is turbocharging, if you
3    will, the downstream market by doing things that cause
4    other people to want to develop their programs, want to
5    develop their diagnostic tests on that platform.  Not
6    just MCED tests, but heart tests and Alzheimer's tests
7    and tests of all kind.  And a foreclosure strategy is
8    disastrous to trying to build out a platform in a way
9    that really expands and grows markets of all kinds.
10        CHAIR KHAN:  And so just to be clear, there would
11   seem to be a tension between you're saying that the
12   incentives line up this way but you also need this open
13   offer in order for customers to believe that, you know,
14   there won't be the types of discrimination that
15   complaint counsel predict, you're saying instead the
16   open offer is necessary -- is just being put on the
17   table despite all the incentives already lining up that
18   way?
19        MR. MARRIOTT:  That is correct.  We do not, Chair
20   Khan, believe that we "need the open offer."  I think
21   Chief Judge Chappell found on two independent grounds
22   that complaint counsel was unable to make out its prima
23   facie case.  I understand Chief Judge Chappell to have
24   ruled, and I think correctly, that Illumina here does
25   not have an incentive here to foreclose, and I

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    understand him to further rule that even if you found

2    that Illumina had an incent to do it, he finds that the

3    open offer is sufficient to curtail any ability that

4    Illumina would have, or incentive for that matter, to do

5    so.

6         So I think those things existed, depending on we

7    don't think we need the open offer, if you will, in

8    order to demonstrate that complaint counsel has failed

9    to make out its prima facie case.

10        CHAIR KHAN:  And in terms of the adequacy of the

11   open offer, I think one question to my mind separate

12   from that is this really going to fully reverse or

13   offset the harm in the way complaint counsel laid out is

14   the role of arbitration, and in a situation where you

15   have contracts between Illumina and testing companies

16   that are multi-dimensional, that are not just about

17   price, but a variety of other terms and conditions, it

18   just seems like there is a base level of complexity that

19   is not well suited for the type of arbitration model

20   that in other instances may, in fact, be successful.

21        You have generalist arbitrators, you have, you

22   know, these inquiries that are not, in fact, public.

23   Explain to me why we should have confidence that the

24   arbitration component here is actually a recipe for

25   success.

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1        MR. MARRIOTT:  Chair Khan, let me, if I may say

2   this, I will directly answer your question and then I

3   will -- so as not to fully steal her thunder, will defer

4   to my colleague Ms. Goswami when she comes up, but I

5   think the answer to the question is, and I think it's a

6   little paradoxical in a way because I think what

7   complaint counsel said she thought was the great

8   weakness of the open offer was its flexibility, and I

9   think, in fact, the flexibility, if I understand what

10  complaint counsel meant, is, in fact, one of its great

11  strengths.

12       The open offer is a real-world assessment of what

13  customers want.  It was developed by taking into account

14  exactly what they want, exactly what they were asking

15  for in real-world conversations and it was taking into

16  account, frankly, what it is complaint counsel was

17  suggesting they thought they had issues with in the

18  transaction.  It endeavors to satisfy customer demands

19  and it does so all while saying that there is an

20  arbitrator, independent third party arbitrator in place

21  who can deal with that complexity and fully empowered

22  beyond ways I think I've seen in any like arrangement to

23  be able to enter and allow any relief necessary to be

24  able to ensure that there is no harm done here, that

25  people are restored, and to the extent there is any

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    shifting of a position to their disadvantage to make

2    sure that is allowed.

3        The arbitrator is expressly instructed to do one

4    thing and that is to arbitrate to reflect that the

5    purpose of the open offer is to allay any concerns with

6    respect to this transaction.  And it goes, again,

7    without stealing the thunder.

8        COMMISSIONER BEDOYA:  Counsel, I apologize, but I

9    need to interrupt, and maybe this is a question for your

10   colleague.  So you said that there would be reputational

11   harm flowing to Illumina from foreclosure, but at least

12   with respect to the four companies that have signed it,

13   I'm reading the open offer, and it is "confidential and

14   binding," and then there's a line on page 9 that says,

15   "Neither party may disclose the existence, content or

16   results of any arbitration without the prior written

17   consent of both parties unless required by law."

18       So how is there a reputational harm if you are

19   gagging the participants to the arbitration regarding

20   alleged foreclosure -- foreclosing conduct?

21       MR. MARRIOTT:  Well, I think let me answer it

22   this way and then I'll have my colleague, if I may, say

23   a little bit more, but I don't believe, Commissioner,

24   that anyone is gagging anyone.  I think the

25   confidentiality provision is all about ensuring that

Oral Argument

Illumina, Inc. and Grail, Inc.                          12/13/2022

1  people's information is protected.  The mere fact, I

2  would say --

3         COMMISSIONER BEDOYA:  But it's not limited to

4  trade secrets or other confidential information, it's

5  the entire existence of the proceeding is secret, unless

6  required by law.  So this isn't an intellectual property

7  or trade secret question, is it?

8         MR. MARRIOTT:  Well, I suppose it depends on what

9  comes up in the arbitration, but it isn't necessarily a

10  trade secret.

11         COMMISSIONER BEDOYA:  And, in fact, the

12  intellectual property claims cannot be arbitrated by the

13  terms of arbitration.

14         MR. MARRIOTT:  That is correct.

15         COMMISSIONER BEDOYA:  So then -- sorry, please go

16  ahead.

17         MR. MARRIOTT:  Yeah, I mean, what I would say is

18  that while the arbitration is itself something that is

19  to remain confidential, that doesn't preclude somebody

20  who is foreclosed from complaining to the marketplace,

21  as people are not shy about doing in the event that they

22  perceive some form of disadvantage being done, you know,

23  being foisted upon them by Illumina.

24         So the confidentiality clause doesn't prevent

25  customer A from telling customer B that they've been

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    foreclosed.  It doesn't prevent customer A from saying

2    that they're hammered in the market because of Illumina.

3    And there's a lot of reputational risk associated with

4    that alone, even if the particulars of the arbitration

5    for which both sides benefit are there to protect what

6    goes on in that arbitration.

7         So it doesn't prevent somebody from, if you will,

8    blowing the whistle and I don't think it gags anybody

9    from saying Illumina is doing bad stuff to me and you

10   should pay attention to this and you shouldn't do

11   business with Illumina.

12        So what I would say, Commissioners, going back to

13   what we think are the kind of five principal flaws in --

14        COMMISSIONER WILSON:  I'm sorry, counsel, if I

15   can just jump in again.

16        MR. MARRIOTT:  Please.

17        COMMISSIONER WILSON:  In Professor Carlton's

18   report, he identifies the reduction in GRAIL's effective

19   royalty rate and gauges the impact of that.  He says the

20   total increase in U.S. consumer surplus from 2022 to

21   2030 is $136.9 million, and but I am curious, complaint

22   counsel has stated that before the transaction GRAIL was

23   exploring with Morgan Stanley ways to eliminate the

24   royalty between Illumina and GRAIL, and so I'm wondering

25   if the elimination of the royalty is merger-specific or

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    whether it could be achieved by contract.

2            MR. MARRIOTT:  It is, Commissioner Wilson,

3    merger-specific.  It is merger-specific because while

4    there was exploration of the kind to which you refer,

5    that exploration entirely utterly failed and that's what

6    the witnesses testified to.  GRAIL had explored it and

7    GRAIL had determined that it did not work and that is

8    one of the reasons why GRAIL went along with the

9    proposed transaction.

10           So it was explored, it failed, and as a result, I

11   think that efficiency is highly merger-specific and, in

12   fact, it has actually already been realized because that

13   eliminated -- that royalty has been eliminated.  It is

14   not a royalty that is being paid today.

15           COMMISSIONER WILSON:  And engaging -- well, in

16   her report, Dr. Fiona Scott Morton assumed that there

17   was a royalty that gets imposed on the other MCED

18   rivals, and can you just give an overview for me of the

19   two or three biggest flaws that you see in Dr. Scott

20   Morton's expert report?

21           MR. MARRIOTT:  Well, sure, Commissioner.  I

22   think, with respect to Dr. Scott Morton, I believe

23   largely her testimony in this proceeding was sort of

24   beyond the scope of her expertise.  I think Chief Judge

25   Chappell expressly found that, if you look at footnote

48

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    35 of the initial decision.

2           And with respect to efficiencies in particular,

3    Dr. Scott Morton's testimony effectively was that there

4    is in her view no reason why the parties couldn't simply

5    have entered into contracts to achieve much of the same.

6    That is the way I would net it out really across

7    efficiencies.  I think that's the testimony she offered

8    with respect to supply chain, and EDM and reduced

9    royalty burden.

10          And I think, in fact, there was no fact testimony

11   to support that at all.  There was simply the assertion

12   of an economist who, in our view, with respect, did not

13   take account of what the actual real-world trial facts

14   were.  And the fact that --

15          COMMISSIONER SLAUGHTER:  I'm sorry, counsel, can

16   you just elaborate on that point?  Why should we not

17   take the economic analysis of an economist seriously?

18          MR. MARRIOTT:  It's not the economic analysis,

19   Commissioner Slaughter, that shouldn't be taken

20   seriously necessarily, it's the facts that are the

21   predicate and the inputs to it.  And Dr. Scott Morton in

22   her analysis simply observed the theoretical possibility

23   that people could have entered into contracts that would

24   eliminate, for example, EDM, or double marginalization

25   of it, or it would eliminate royalty burden.  But, in

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    fact, and while it's certainly a theoretical possibility

2    in this case and in any other case, there is not any

3    historical evidence of such a thing ever happening with

4    respect to these companies, and there's not any fact

5    witness who supported the proposition that that was

6    something that was likely or even reasonably possible to

7    occur in this case.

8           So it's the difference between theory on the one

9    hand and then the facts as they were actually adduced in

10   the case on the other.

11          So with that, with respect to the first, we

12   think, principal flaw in Chief Judge Chappell's -- in

13   complaint counsel's case is really Chief Judge

14   Chappell's finding that the transaction will not

15   substantially lessen competition, and complaint

16   counsel --

17          CHAIR KHAN:  Counsel, you were going back and

18   forth with Commissioner Wilson on efficiencies, I just

19   want to get a better understanding of your view of how

20   we should be considering this at all, right?  So if we

21   determine that the transaction is, in fact,

22   substantially likely to harm competition in MCED tests,

23   are you then offering these efficiencies as an

24   efficiency defense or how are you suggesting that we

25   weigh these against the innovation harms that we might

50

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    find?

2         MR. MARRIOTT:  So, Chair, if you find Chief Judge

3    Chappell got it wrong as to whether or not there will be

4    a substantial lessening of competition, if you find that

5    he got it wrong with respect to the open offer, then we

6    think, respectfully, that there are yet alternative

7    grounds by which and under which Chief Judge Chappell's

8    decision can and will be affirmed.

9         One of those is the efficiencies.  We have, we

10   think, adduced considerable evidence of efficiencies

11   along a bunch of different dimensions, and we think

12   those efficiencies easily offset the alleged harm.  We

13   don't think there is any harm here that's been

14   substantiated, but we think even if you accept it as

15   substantiated, we believe, respectfully, that it is

16   easily offset by the efficiencies as to which there has

17   been largely unrefuted evidence.

18        And when I say unrefuted, I don't mean that

19   complaint counsel doesn't disagree with us, I mean that

20   the actual evidence adduced at trial demonstrates these

21   efficiencies.

22        CHAIR KHAN:  And what precisely gives you such

23   confidence that it was so clearly outweighed?  We're

24   talking about the entire trajectory of innovation here

25   potentially, right?

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1       MR. MARRIOTT:  What gives me such confidence is

2    the following, Madam Chair:  The evidence here

3    demonstrated, and I've alluded to it here a few minutes

4    ago, is that everybody agrees that MCED tests can save

5    lives.  The undisputed evidence here was that the

6    acceleration of this test by a year has the potential to

7    save some 10,000 lives in the United States alone, and

8    18,000 to 25,000 lives worldwide.

9       And the evidence from the fact witnesses and from

10   the expert witnesses demonstrated that reuniting these

11   two companies will accelerate the adoption of that test

12   and by accelerating the adoption of the test will result

13   in lives saved.  We could put numbers upon that.  I

14   don't think that's the ideal way to think about saving

15   10,000 lives, but we can put numbers on that and those

16   numbers then are in excess of some 35 billion a year.

17      By contrast, there is absolutely no evidence, we

18   submit, presented by complaint counsel, of any harm

19   either to the current market, in which only Galleri is

20   the -- Galleri is the only test available, or to the --

21   or to the so-called R&D market.  The harm hypothesized

22   by complaint counsel is that somehow there being damage

23   done to research and development, but you heard --

24      CHAIR KHAN:  And just to be clear, you're

25   offering the efficiencies as then a defense.  Is that

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    right?

2          MR. MARRIOTT:  Well, I absolutely think they're a

3    defense in the event the Commission rejects the two

4    reasons on which Chief Judge Chappell opined and ruled.

5          CHAIR KHAN:  And what do you see as the strongest

6    case suggesting that even if we find harm to competition

7    that we should be considering efficiencies defense here?

8          MR. MARRIOTT:  Because the acceleration of this

9    test will save 10,000 lives.

10         CHAIR KHAN:  As a matter of case law, what do you

11   see as the strongest case law?

12         MR. MARRIOTT:  In support of the idea that the

13   efficiencies should be considered by the Commission?

14         CHAIR KHAN:  If we find that there would be harm

15   to competition, that then efficiency is appropriate for

16   us to consider efficiencies as a defense here.

17         MR. MARRIOTT:  I think that, you know, any number

18   of cases demonstrate that the -- that the efficiencies

19   are to be part of the calculus.  AT&T comes to mind

20   as --

21         CHAIR KHAN:  There's a difference between part of

22   the calculus and a defense, right?

23         MR. MARRIOTT:  There is, I suppose, a difference

24   between the two.  Yes.

25         CHAIR KHAN:  And so you're saying you're

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    comfortable with either or there's one you're advocating

2    but not the other?

3         MR. MARRIOTT:  When you say one or the other,

4    Commissioner, I'm not sure I understand the question.

5         CHAIR KHAN:  You're saying it's part of any

6    initial analysis or if the Commission comes out in

7    finding that on net there is harm to competition, then

8    there is an opportunity for you all to say, yes, but

9    here are all these efficiencies that should serve as a

10   defense?

11        MR. MARRIOTT:  Well, I think it's both.  I think

12   that if you are undertaking the analysis of determining

13   whether there has been a substantial lessening of

14   competition, I think it is important in that context to

15   take into account all of the real-world facts, and I

16   think all of the real-world facts include some of the

17   consequences of this transaction.  That includes things

18   like EDM.

19        And if you find there nonetheless is harm, I

20   think, you know, that I think there are nonetheless

21   cases in the event you find harm that indicate that the

22   efficiencies ought to be taken into account, can be

23   taken into account, and can be a so-called defense.  And

24   I would include among them, I guess most recently, the

25   Deutsche Telecom case.  I think the burden of persuasion

54

Oral Argument

Illumina, Inc. and Grail, Inc.                              12/13/2022

1    at the end of the day here, allays, I think, and

2    everybody agrees with this, on complaint counsel and it

3    relies -- it rests on them at all times.

4         And so it is both a defense and it is, I think,

5    in fact, a part of the overall analysis into figuring

6    out whether there has been a substantially lessening of

7    competition.

8         CHAIR KHAN:  And what would you point to, just

9    real quick, what would you point to as the best

10   substantiation of all of these efficiency claims which,

11   candidly, I think at various points can read as quite

12   speculative?

13        MR. MARRIOTT:  With respect --

14        CHAIR KHAN:  Are there ordinary course documents

15   or other type of evidence that you would point us to?

16        MR. MARRIOTT:  There is a lot I would point you

17   to, Commissioner, and let me give you some examples and

18   I would submit that they are not speculative.  I would

19   point you to the testimony of several fact witnesses,

20   Frances deSouza, Alex Aravanis, Phil Febbo, Jay Flatley.

21   I would point you to the testimony of Dr. Carlton, who

22   undertook to quantify it.  Dr. Cody, Dr. Abrams,

23   Dr. Deverka.  And I would point you to the ordinary

24   course deal related documents which demonstrate a

25   genuine belief on the part of the company and on the

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    part of those developing the deal model as to what the
2    prospects of this transaction were.
3         This transaction was approved by the unanimous
4    board of both Illumina and GRAIL.
5         CHAIR KHAN:  Just so I understand, when I ask
6    what is -- what would you point to as the best
7    substantiation of these efficiencies, the things that
8    you would point to are the testimony that was taken in
9    the course of this action, as well as deal documents
10   created in the course of putting together this proposal,
11   but there are no separate documents in the ordinary
12   course that you would point me to.  Is that right?
13        MR. MARRIOTT:  That's not right.  I mean, I think
14   the ordinary course documents that describe the
15   operation of the business, right, make perfectly clear
16   that these are efficiencies that will happen.  I mean,
17   again, some of the efficiencies have already happened.
18   There is not any question that the royalty burden has
19   been eliminated.  And I think the documents that are --
20   millions of which, frankly, have been produced, are
21   supportive of the efficiencies as to which there has
22   been I think largely undisputed testimony.
23        I mean, the witnesses of Illumina and GRAIL who
24   spoke to the efficiencies, largely I would urge you to
25   read the cross examinations which largely didn't touch

Oral Argument

Illumina, Inc. and Grail, Inc.                               12/13/2022

1    whether or not these efficiencies exist or don't exist.

2         COMMISSIONER BEDOYA:  Counsel, I know this is

3    counterintuitive, but if EDM is, in fact, large, isn't

4    that a strong economic argument that Illumina is, in

5    fact, a monopolist?  Because if the upstream input

6    is competitive, there shouldn't be much of an

7    elimination of market power, whereas if Illumina is a

8    monopolist, there should be a substantial elimination of

9    that power with vertical integration.

10        So how would you answer that argument that a

11   large EDM -- asserted EDM -- would, in fact, weigh in

12   favor of Illumina having pretty extraordinary market

13   power?

14        MR. MARRIOTT:  Well, Commissioner, I would say, I

15   guess, in this case, in the grand scheme of things, I

16   think the elimination of double marginalization is not

17   one of the more significant -- I think it's significant,

18   but it is not one of the more significant efficiencies,

19   but nonetheless, there is a margin, and it is declining

20   because of competitive restraints.  But there is a

21   margin nonetheless.

22        COMMISSIONER BEDOYA:  Thank you.

23        MR. MARRIOTT:  I see that I have left my

24   colleague only six minutes, so with your permission, I

25   will pass the baton to Ms. Goswami.  Thank you very

Oral Argument

Illumina, Inc. and Grail, Inc.                    12/13/2022

1    much, Commissioners.

2         MS. GOSWAMI:  Thank you.  I'll just focus on

3    one --

4         CHAIR KHAN:  We can't hear you, counsel.

5         MS. GOSWAMI:  Can you hear me now?

6         CHAIR KHAN:  Yes.

7         MS. GOSWAMI:  Thank you.  Sorry about that.  I

8    still don't know how to use Zoom apparently.

9         So it's undisputed that -- it's indisputable, in

10   fact, that premerger, no customer had access to terms

11   that were anywhere near as favorable as those in the

12   open offer, and customers are better off with the open

13   offer, and that's why all but two of the MCED test

14   developers that complaint counsel has identified have

15   signed it.

16        COMMISSIONER BEDOYA:  Counsel, I apologize for

17   interrupting so quickly, but isn't the question not

18   whether they are better off but competition is better

19   off, and I find it hard that competition is better off

20   in a world where the testers are forced into arbitration

21   that is confidential, effectively secret, where the

22   adjudicator is not in Article 3 or a magistrate judge,

23   and where there is no representation of the government

24   or the public interest.

25        So even if this works out fine for them, isn't

58

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    there a broader question about how it's going to affect
2    competition, and isn't there an argument that all this
3    should be public if the whole purpose of this is to
4    protect competition and not just competitors?
5          MS. GOSWAMI:  So I have a few answers to your
6    question, Commission Bedoya.  So the first point is that
7    while the arbitration itself is confidential, obviously
8    as we've been talking about, you know, what is happening
9    with the audit, and the fact that there will be an audit
10   and that any violation under the audit will be made
11   available to any of the open offer customers within ten
12   days.  You know, that part, again, it's not open to the
13   general public, but it's open to each of those
14   competitors.  And, in fact --
15         COMMISSIONER BEDOYA:  Is the government or a
16   public interest representative on that audit?
17         MS. GOSWAMI:  The government and public interest
18   is not represented in that audit, but I think as the
19   Commissioners are well aware, you can take the approach
20   of the District Court in the Butterworth case and you
21   can decide to implement the open offer as a consent
22   decree.  And so then there would -- the government would
23   have more of a role, but what we -- what has happened
24   here is, you know, all of these customers have
25   voluntarily entered into the open offer, and I want to

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    stress that point, because nobody is being forced into

2    arbitration.

3           So customers, they're able to enter into the open

4    offer until August 18th, 2027.  What we've seen is that

5    ten people have already entered into the open offer.

6    They could have decided to keep the supply agreement

7    that they had premerger.  They could have decided --

8    some people actually just buy off the website

9    essentially.  They don't have any kind of supply

10   agreement at all.  They could have continued to do that.

11   They voluntarily decided to enter into the open offer.

12          And that's because as the Chief Judge Chappell

13   found, the open offer provides additional benefits, and

14   those benefits are, to answer your question further,

15   Commission Bedoya, those are not just benefitting those

16   particular customers, but it's benefitting, you know,

17   competition as a whole because all of these competitors

18   are able to get access to sequencing and sequencing

19   services under the same terms that they did premerger,

20   if that's what they choose, or they can decide to use

21   what's known as the universal grid, where everyone gets

22   access to the same pricing.

23          And what's even more beneficial is there's

24   actually a 43 percent guaranteed price reduction by 2025

25   in the open offer, and where that 43 percent number

JA2302

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    comes from is when Illumina made its deal model to

2    decide whether to buy GRAIL, it had a certain projection

3    of what GRAIL would pay for sequencing.  And what

4    Illumina did in the open offer is take that number to

5    what GRAIL would pay for sequencing that built the

6    framework for why Illumina could buy GRAIL and plan to

7    make a profit, and gave that price to every single GRAIL

8    competitor.

9          And again, that's really protective of the

10   customers and it makes sure that not only can you keep

11   what is the premerger status quo as one option, you can

12   actually pick an option that guarantees that your prices

13   will go down.

14         And then the other thing that is key here is also

15   the access provision.  So --

16         COMMISSIONER WILSON:  I'm sorry, counsel, let me

17   just ask a question about pricing.  There are two

18   different categories of pricing that customers can

19   choose, one is grandfathered and one is universal

20   pricing.  Are they allowed to switch back and forth

21   between those two types of pricing during the course of

22   the agreement?

23         MS. GOSWAMI:  They are allowed to switch from

24   grandfather pricing to universal pricing.  They can't

25   switch back again then to grandfather pricing for the

Oral Argument

Illumina, Inc. and Grail, Inc.                        12/13/2022

1   simple reason that if people stop buying a particular

2   product it may be difficult to then bring it back once

3   no one is buying it anymore, but there is a guarantee

4   that they can switch to universal pricing at any time.

5   And otherwise they can keep using the same premerger

6   grandfather pricing for the entire 12 years under the

7   open offer.

8        COMMISSIONER WILSON:  Thank you.

9        MS. GOSWAMI:  And so the second important thing

10  that I want to draw everyone's attention to is the

11  access term.  So, again, where the open offer came from

12  is that Illumina reached out to what were known as its

13  tier 1 customers, customers that had tens of millions of

14  dollars of spend on Illumina's platform, and asked them,

15  well, what are the terms that you want in this open

16  offer?  And one of the things that they wanted is they

17  wanted to make sure that everyone gets access to the

18  same sequencing products, including, you know,

19  instruments and core consumables at the same time as

20  each other.

21       And so before there was -- there were some pilot

22  testing, there was some, you know, beta testing, that --

23  there's no kind of disparity in terms of when customers

24  get access to the products.

25       And then the flip side of that is what I just

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    alluded to with the grandfather pricing.  You know,

2    premerger, there was always a chance that when there

3    would be upgrades on these instruments, and we've all

4    faced this, you know, when there are upgrades on these

5    instruments that you can no longer get the old

6    instrument that you are using, Illumina also got rid of

7    that under the open offer.  You can decide that you

8    always have an option that you can keep buying the same

9    instrument that you bought before at the same price or

10   you can switch to a new instrument and you can also get

11   a 43 percent discount.  And that is making customers

12   better off.

13        And the reason why we know that customers are

14   better off is because with they've signed it, and that's

15   one of the things that Chief Judge Chappell found.  He

16   said, the fact that GRAIL's purported rivals have signed

17   the open offer is significant and undermines complaint

18   counsel's assertions --

19        CHAIR KHAN:  Counselor, in addition to the

20   details of the open offer, one key issue here is really

21   who carries the burden and at what stage it's

22   appropriate for us to consider the open offer.  Should

23   it be considered as part of the prima facia analysis or

24   should it be considered as a remedy?  The initial

25   decision chose to consider it -- argued that it should

63

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    be considered as part of the prima facie case and you
2    all support that view.  Could you share what in your
3    view is the strongest case in support of that approach
4    as opposed to considering it as part of the remedy given
5    that in Otto Bock and a whole bunch of other cases that
6    complaint counsel cites these types of offers are
7    instead considered at the remedy stage?
8            MS. GOSWAMI:  So probably the two strongest cases
9    are U.S. v. AT&T and then a recent case which is a
10   United Healthcare Group case from the district of D.C.
11           CHAIR KHAN:  And on AT&T, complaint counsel
12   distinguishes that in a whole range of ways, including
13   the fact that that was addressing a discrete type of
14   conduct, that there was a whole set of factors that they
15   identified.  Do you have any response to the ways in
16   which they distinguish AT&T?
17           MS. GOSWAMI:  So I think they're in our papers,
18   but just very briefly, it's not really distinguishable
19   in the way that complaint counsel tries to distinguish
20   it.  What the court found in that case, and the D.C.
21   Circuit affirmed, is that the government failed to meet
22   its burden of proof because its lead economics expert
23   failed to consider AT&T's post-litigation offer of
24   arbitration agreements to distributors.  And that's the
25   same thing that happened here.  They didn't consider the

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    open offer in terms of deciding the prima facie burden.

2         But if I may, I want to spend a moment on the

3    United Healthcare case as well.  In that case, and I'm

4    just going to read from it, in the government's view,

5    and there they talk about different remedy, but I'll

6    just say the contractual commitment must be ignored at

7    the prima facie stage, at least that the contractual

8    commitment was not part of the original transaction.

9         Then, in the government's view, a defendant must

10   prove that there is no lessening of competition, and

11   then the court went on to say, rejecting this exact

12   argument that complaint counsel is making here, this

13   would allow the government to rely on statistics that

14   bear no relationship to the post-acquisition world and

15   would shift the burden of persuasion to the defendant to

16   prove that there is no competitive harm, rather than to

17   require the government to prove that there is

18   substantial competitive harm.  That approach cannot be

19   squared with the text of Section 7 or with Baker Hughes.

20        And that is --

21   CHAIR KHAN:  Thank you, Ms. Goswami, I realize

22   that we are out of time, but I understand your position

23   that you think that that case is in strong support of

24   what you're arguing.

25        So thank you.  We will now return back to

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    Ms. Musser.

2         MS. TABOR:  Before we do that, Madam Chair, I

3    just wanted to note for the record that near the end of

4    complaint counsel's argument in chief, the clock was

5    prematurely paused at 14 minutes and 59 seconds.  And

6    stoppage of the clock, however, was premature, as

7    complaint counsel continued to speak and, in fact,

8    responded to a question from the chair.

9         So our backup clock, which continued to run,

10   shows that complaint counsel actually stopped speaking

11   at 13 minutes and 21 seconds remaining in the total time

12   allotted for its argument.  What I am doing is I am

13   noting that respondent also spoke for approximately 53

14   seconds over its allotment, which I am offsetting for

15   the time that respondents' counsel was muted, which

16   means that the total amount of time for complaint

17   counsel's rebuttal should be 14 minutes and two seconds,

18   and I would like the clock to be updated to reflect

19   that.  Thank you.

20        Go ahead when you're ready, Ms. Musser.

21        MS. MUSSER:  Thank you, Ms. Tabor.

22        I want to start where my colleague, Ms. Goswami,

23   left off.  First I would like to address kind of a key

24   premise of hers and of respondents was that this open

25   offer made folks better off.  Every single MCED who

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    testified at the hearing that signed the open offer said

2    that they, in fact, did not -- this did not make them

3    better off and instead that this -- that they still had

4    significant concerns.  And let's talk a little bit about

5    that number.

6         There has actually only been two MCEDs who signed

7    the open offer, according to record evidence, and that

8    is -- there have only been two.  I'm going to be careful

9    here, I don't know what's in camera, but there are two

10   who signed the open offer, there are two who signed

11   long-term supply agreements absent the open -- or

12   separate and apart from the open offer, and there are

13   the remaining MCED witnesses who testified who have not

14   signed any long-term supply agreement.

15        And I think there are a couple of key facts to

16   take away from this.  If this open offer were that good,

17   the witnesses wouldn't be testifying that they still had

18   significant concerns.  Couple that with testimony in the

19   record that explains several of these MCED witnesses

20   were, in fact, negotiating a separate supply agreement

21   separate and apart from this open offer when those

22   negotiations were abruptly cut off and the terms got

23   worse.  That is the testimony from the witnesses that

24   were part of the record.

25        Separate, I want to discuss United/Change and the

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1     policy implication regarding when the case should or

2     when a remedy should be considered as part of the Baker

3     Hughes analysis.  In the first instance, to the extent

4     that United/Change considered it as part of the prima

5     facie case, that case involved a divestiture.

6          And so Ms. Goswami quoted a select part of the

7     United/Change provision that said that the numbers would

8     need to take into account the remedy.  There, there was

9     a horizontal overlap and the court was referring to

10    market share that needed to account for this

11    divestiture.  Here, the open offer is fundamentally

12    different from that in three key ways.

13         First, the open offer itself is a made for

14    litigation piece of paper.  It was entered into days

15    before this complaint was issued and the preamble

16    explains that the purpose was to allay any concerns

17    relating to the transaction.

18         Second, this open offer has not been adopted

19    across the market.  It is not a fundamental market

20    change.  Rather, it has only been selectively adopted by

21    MCED customers, the same ones who are saying it's not

22    sufficient to alleviate the harms of this transaction.

23         And third, the open offer is only available until

24    final order by this Commission.  It is not a fundamental

25    change in the market.

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1          Setting that aside, and despite the United/Change
2     and AT&T opinion, the better policy choice is for
3     respondents to bear the burden of assessing -- of
4     proving that the open offer offsets harm.  And that's
5     for four reasons.
6          First, from the institutional perspective,
7     requiring respondents to prove remedy is effective to
8     encourage them to propose adequate remedies instead of
9     only spatially plausible remedies such as what we have
10    here.
11         Second, when assessing who has the burden, the
12    courts look at who has access to the relevant facts.
13    The Supreme Court gave us this directive in Smith v.
14    United States.  Here, respondents have unique access as
15    to how this open offer would work and therefore should
16    bear the burden of proof.
17         Third, requiring complaint counsel to prove
18    remedy will work in a way that artificially heightens
19    complaint counsel's burden to prove a negative in a way
20    that's inconsistent with the incipiency standards
21    intended by Congress in establishing the Clayton Act.
22         And fourth, shifting the burden as to inadequacy
23    of the remedy onto complaint counsel puts the
24    presumptions laid out in Baker Hughes and squarely
25    shifts the risk associated with the remedy onto

69

Oral Argument

Illumina, Inc. and Grail, Inc.                                      12/13/2022

1    consumers instead of keeping it on respondents as part
2    of this rebuttal case.
3         Second, I would like to address a few of the
4    arguments that this Commission heard relating to
5    efficiencies.  In the first instance, for many of the
6    same reasons as efficiencies -- as are laid out in
7    remedies, efficiencies should also be considered part of
8    respondents' burden.  In the first instance, and
9    specifically in EDM, their own expert addressed these as
10   an efficiency, not as part of the prima facie case.
11        Second, a proper application of the Baker Hughes
12   framework also requires that this be shifted to
13   respondents in order to keep within a burden shifting
14   framework and not to relax that framework but that
15   complaint counsel has to prove everything in the first
16   instance.
17        And, finally, much like those remedies, and under
18   the Supreme Court precedent, respondents have unique
19   access to how these efficiencies would work and
20   therefore should meet the burden.
21        And now, courts are very clear about what it
22   takes to meet that burden.  This Commission in Otto Bock
23   spelled that out, as well as the Third Circuit recently
24   in Hackensack.  And it requires that respondents show
25   that their efficiencies are cognizable.  And in doing

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    so, the court in Burtlesmann and H&R Block were very

2    specific that it cannot just rely on the testimony and

3    business judgment of company executives, because no

4    matter how well intentioned or how adept they are at

5    business matters, that is not sufficient to meet the

6    burden of proof in order to show cognizable

7    efficiencies.

8          And when this Commission asked my colleague from

9    respondents as to what evidence they should look at, he

10   answered, well, of course, how can it not?  But how can

11   it not cannot be sufficient to offset the risk of this

12   merger and assure that consumers are not harmed.

13         A few specific efficiencies I would like to

14   address.  The first is royalty.  I would like to direct

15   this Commission to our proposed finding or our complaint

16   counsel's findings of fact at 5457 through 5775.  What

17   the evidence actually showed was that testimony or that

18   testimony explains that the discussions regarding

19   elimination of royalty ended as the parties began

20   exploring a deal.  Not that it couldn't happen, it's

21   just that they were prematurely stopped.

22         Second, there is testimony that this was never

23   raised with Illumina prior to this deal.  And finally,

24   royalties can't be assessed in a vacuum, but instead

25   need to be analyzed in conjunction with the CVR or

71

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    contingent value rights, and in looking at those

2    together, any value of the remedy is offset by the CVR.

3         Second, I would like to talk for a minute about

4    acceleration.  Going back to acceleration, and when you

5    look at the testimony and the evidence that my colleague

6    Mr. Marriott pointed to, it was again just the executive

7    and just the experts, but there are no ordinary course

8    documents that put a number on it and quantify it.

9         There are also sufficient -- extensive evidence

10   in this record that shows that this -- that there is

11   nothing unique that Illumina has.  It has no secret

12   sauce that necessitates this merger to drive adoption

13   and acceleration of this test to market.

14        COMMISSIONER WILSON:  Counsel?

15        MS. MUSSER:  Yes, Commissioner Wilson?

16        COMMISSIONER WILSON:  Thank you.  Respondents'

17   expert, Dr. Carlton, describes testimony from Exact that

18   Exact's acquisition of Thrive increased the speed of FDA

19   approval, and I'm wondering what you see as the

20   similarities and differences between Illumina's

21   acquisition of GRAIL and Exact's acquisition of Thrive

22   and to what extent those acquisitions may be similar in

23   terms of facilitating more expedited FDA approval.

24        MS. MUSSER:  Absolutely, Commissioner Wilson.  So

25   Exact's acquisition of Thrive was an acquisition of two

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    companies who do the same thing, and that is in direct

2    contrast from an acquisition of a tool provider to an

3    MCED test.  So Thrive and Exact had sales forces that

4    could be combined and synergized that were selling a

5    clinical tool and could use the same thing.

6         Likewise, Exact had specific success on bringing

7    a test to market from its Cologuard, which is a

8    stool-based cancer detection test for colon cancer.  And

9    so those -- it had specific facts and specific expertise

10   that enabled it to have some synergies in perhaps

11   bringing Exact to marker.

12        In contrast, and as I mentioned earlier, Illumina

13   doesn't have that same expertise.  It hasn't gotten a

14   clinical approval of its most similar test, an IPT test,

15   it still doesn't have FDA approval, and it, in fact, has

16   struggled with the few tests it has tried to bring to

17   the market and to get approved through the FDA.

18        So I think that comparison actually shows the

19   differences and why Illumina fails to meet its burden to

20   show merger-specific efficiencies such as acceleration.

21   Moreover, there is no number that they've been able to

22   provide.  They haven't been able to specify how soon or

23   to provide any sort of specificity as to exactly what is

24   going to enable them to bring -- to have a unique secret

25   sauce to bring the GRAIL test to market sooner that they

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1    couldn't get from somewhere else.

2          And, finally, I would like to end by going

3    back --

4          CHAIR KHAN:  Counsel, I just want to make sure,

5    mindful of the time, I wanted to make sure that we had a

6    response from you on a point that Illumina raises in

7    response to the proposed remedy.  So the proposed order

8    would require Illumina to return to GRAIL any proceeds

9    of the sale that exceed Illumina's investment amount,

10   and Illumina makes a host of claims on this.  They say

11   that it's outside the bounds of contemplated relief,

12   that they didn't have an opportunity to have a hearing

13   on this relief and that this would constitute

14   impermissible disgorgement.  Could you just share your

15   responses to those arguments?

16         MS. MUSSER:  Absolutely.  So taking a step back,

17   the remedy here is designed to do what all remedies are

18   designed to do at this Commission, which is to make

19   GRAIL whole.  And for the most part, this remedy follows

20   the well-trod precedent from this Commission about how a

21   remedy can do that.  It's a divestiture combined with a

22   hold separate, which is what we normally do or the

23   Commission normally does in consummated cases.  It

24   differs in a few key respects, such as the cap on how

25   much profits Illumina can maintain.

74

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1       I want to be clear, this is not disgorgement.
2   This was not intended to punish or penalize Illumina for
3   purchasing GRAIL.  Rather, this cap on profits is
4   designed to make sure that the money returns to GRAIL
5   and that GRAIL is put in the best position to be as
6   competitive an MCED as possible.  So it's designed to
7   return the precompetitive position that GRAIL would have
8   been in but for this merger.
9       CHAIR KHAN:  And specifically, their claim that
10  they have not had a hearing on the specific relief
11  that's now being requested, how would you respond to
12  that?  Was there anything else that would have informed
13  respondents of the relief being sought before the filing
14  of the proposed order?
15      MS. MUSSER:  I think the general principles as
16  far as the -- what they're doing with GRAIL's purchase
17  price, off price, all of that is in the record, and so
18  there is nothing that would be gained from further
19  evidentiary analysis or development such that there
20  would necessitate a separate evidentiary hearing or a
21  hearing on the remedy.
22      CHAIR KHAN:  Okay.  Thank you.
23      MS. MUSSER:  So again, I want to take a step back
24  and go back to 2016, because I think 2016 is informative
25  as to the change that will occur or once Illumina goes

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

1  from having a majority ownership or from a 12 percent
2  ownership to a majority ownership.  And in 2016,
3  Illumina spun out GRAIL.  And when it did, it went from
4  an owning a majority to being just near a 12 percent
5  institutional investor.
6        And in talking points to investors, Illumina's
7  CEO -- former CEO drafted talking points that explained
8  that this reduction from being a majority to 12 percent
9  ownership was what was going to level the playing field
10 and spur innovation.
11       That is exactly the innovation and the level
12 playing field that complaint counsel asks this
13 Commission to protect.  As such, when the Commission
14 looks at the majority of the evidence, we ask that it
15 will adopt complaint counsel's proposed remedy to allow
16 just this competition to flourish in this life-saving
17 market under the Clayton Act incipiency standard.
18       Thank you for your time today.
19       CHAIR KHAN:  Thank you, Ms. Musser.
20       Thank you, also, to Mr. Marriott and Ms. Goswami
21 for your presentations.
22       This marks the end of today's hearing, and so we
23 are adjourned.
24       (Whereupon, at 2:38 p.m., the argument was
25 adjourned.)

Oral Argument

Illumina, Inc. and Grail, Inc.                                    12/13/2022

```
 1                    CERTIFICATE OF REPORTER
 2
 3         I, Sally Jo Quade, RPR, do hereby certify that
 4    the foregoing proceedings were recorded by me via
 5    stenotype and reduced to typewriting under my
 6    supervision; that I am neither counsel for, related to,
 7    nor employed by any of the parties to the action in
 8    which these proceedings were transcribed; and further,
 9    that I am not a relative or employee of any attorney or
10    counsel employed by the parties hereto, nor financially
11    or otherwise interested in the outcome of the action.
12
13
14
15
16                   _____
17                   SALLY JO QUADE, RPR
18
19
20
21
22
23
24
25
```